ROBERT M. SOLA, Petitioner-Appellant, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents-Appellees.

First District (3rd Division)   No. 1—98—2665

Opinion filed September 20, 2000.

Arnold & Kadjan, of Chicago (L. Steven Platt, of counsel), for appellant.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Karen J. Dimond, Assistant Attorney General, of counsel), for appellees Human Rights Commission and Department of Human Rights.

Wildman, Harrold, Allen & Dixon, of Chicago (Fredrick H. Bates, of counsel), for appellee International Business Machines Corp.

JUSTICE BURKE delivered the opinion of the court:

Petitioner Robert Sola (Sola) appeals from a summary decision of defendant Illinois Human Rights Commission (the Commission) dismissing his complaint against respondent International Business Machines Corporation (IBM), alleging that IBM discriminated against him on the basis of age when it designated him as "surplus" and permanently laid him off[1] in violation of the Illinois Human Rights Act (the Act) (775 ILCS 5/1—102 *et seq.* (West 1998)). This matter is before this court on direct appeal pursuant to Supreme Court Rule 335 (155 Ill. 2d R. 335) and section 3—113 of the Administrative Review Law (735 ILCS 5/3—113 (West 1998)). On appeal, Sola contends that the summary decision was improper because the Commission utilized the wrong legal standard in assessing whether he adduced sufficient evidence to create a triable issue of fact, the Commis-

---

[1]Although Sola uses the term "termination" in his brief, the record demonstrates that he in fact retired following his designation as surplus.

sion ignored, minimized, or confused evidence, the Commission erred in holding no case law supported his position that IBM failed to adhere to seniority-based reduction-in-force policies, and the Commission misapplied reduction-in-force case law. For the reasons set forth below, we affirm.

The relevant facts in this case are taken from Sola's affidavit and the affidavits of IBM's other employees, unless otherwise indicated. We initially note that Sola's affidavit contains no facts regarding his work history or any activities or events that occurred during his employment with IBM. The affidavit relates only to the various exhibits he offered, which are disjointed, unorganized and, at times, unclear as to their source. Thus, the basic facts of Sola's employment history and his ultimate resignation are taken mainly from the employee affidavits supplied by IBM, including those of Kimberly Kupczyk, Keith Heideman, and Sharon Whitlock.

Sola first began working for IBM on June 14, 1965, as an associate systems engineer. Thereafter he held a variety of positions, including senior store systems engineer and customer support representative.

According to Heideman, Sola's second-line manager, in the winter of 1993, IBM established the "Area Configuration Team" (the ACT Team or Team) based on services needed for four business groups: product marketing, software marketing, availability services, and customer service organization. The Team was designed to handle the software and hardware configurations for these four groups. At the time the Team was formed, IBM believed it needed 8 to 12 individuals with skills in large systems (ES/9000), mid-range systems (AS/400), work stations, and networking systems. In early 1994, Sola was recommended for the Team based on his AS/400 skills and administrative experience. Sola was designated a "generalist" and became the staff information center analyst on the Team. This was the last position he held with IBM. Whitlock was assigned as the Team leader and was responsible for the day-to-day operational management of the Team. Kupczyk was Sola's first-line manager and was responsible for personnel issues and his career development. In her role as Team leader, Whitlock reported to Kupczyk frequently on the performance and progress of various Team members. The other Team members were: Steven Fischer, Andrea Adamson, Jeff Laniewski, Margaret Lindenberger, Kevin McInerney, Paul Rawlins, and Zoe Miron.

All three individuals averred that in the late summer of 1994, IBM determined that the Team's skills were not in accord with customer demands: 80% of the demand was for large system configurations. At this time, only two Team members possessed large system configuration skills. Thus, management determined that more staff was needed

for large systems and less in the other areas. Based on this, it was determined that approximately three Team members had to be eliminated.

At about the same time and independent of the above determination, IBM announced its "Employee Transition Plan" (the IETP), a reduction-in-force plan based on IBM's need to become more competitive and efficient. The plan would reduce the overall number of employees while retaining the critical skills necessary for IBM to service its customers. An IBM memorandum, dated September 8, 1994, stated that IBM would be eliminating 3,000 positions across the country, or 7% of its force. According to the memorandum, a majority of the positions to be eliminated would be support staff. Under the plan, each general manager was required to designate certain employees as "surplus," based on the manager's sole discretion. One method of implementation of the plan involved staff reduction. In this respect, management analyzed the various units of the business to see where employees could be eliminated without significantly impacting upon IBM's service level. Once it was decided how many employees would be laid off in any given unit, managers of that unit identified the skills to fulfill the unit's mission. Once the skills were identified, each employee in the unit was assessed and those with the weakest skills were designated surplus.

The ACT Team was one area targeted by the reduction-in-force plan. According to Kupczyk, IBM assessed the Team's overall productivity and business needs, and it determined that three members had to be eliminated. Whitlock averred she was responsible for identifying the necessary skills to fulfill the Team's mission—those skills critical to the success of the Team. She identified the following skills: AS/400 configuration skills; effective use of hardware/software tools and administrative systems supporting the configuration process; high level of productivity and accuracy; effective multiplexing (handling multiple tasks concurrently); good communication skills; teamwork; customer relation skills; an understanding of the ES (mainframe computer) hardware/software platform; good business judgment; organizational skills; and creativity to improve the configuration process.

Heideman and Kupczyk met to determine which three members would be eliminated based on a comparative assessment of the skills of each Team member. Each of the seven members was assessed in accordance with the criteria and Sola (56), Fischer (45), and McInerney (43) were designated as surplus. Those members who were not surplused were Adamson (36), Laniewski (31), Rawlins (52), and Linden-

berger (45).[2] Sola, Fischer, and McInerney were assessed as compara-, tively weaker than those members who were retained. According to Kupczyk, Sola's overall productivity was the lowest in the group. As Sola's day-to-day supervisor, Whitlock agreed with Kupczyk's and Heideman's assessment of Sola's skills as comparatively weaker than those of the rest of the Team in the areas of technical configuration skills, communication skills, and customer relationship skills. Further, his overall productivity was the lowest in the group. All three averred they were unaware of Sola's age while working with him and that age had nothing to do with the assessment of his skills or designating him as surplus.

On September 24, 1994, Kupczyk advised Sola he had been designated as surplus and that he would be permanently laid off as of November 30, 1994. In response to his designation as surplus, Sola retired as of November 30, 1994, five days prior to reaching age 57.

On October 3, 1994, Sola filed a charge of discrimination with the Department, alleging he had been discriminated against based on his age. Thereafter, Sola filed a verified complaint with the Department pursuant to the Act. 775 ILCS 5/1—102 *et seq.* (West 1998). Following discovery, IBM filed a motion for summary decision pursuant to the Illinois Administrative Code (the Code) (56 Ill. Adm. Code § 5300.735(b) (2000)), alleging that Sola could not demonstrate discrimination because he could not establish a *prima facie* case, IBM could set forth a legitimate, nondiscriminatory reason for Sola's lay off, and Sola could not demonstrate that its reason was pretextual. In support of its motion, IBM attached the affidavits of Kupczyk, Heideman, and Whitlock, discussed above.

In response, Sola argued that various memoranda, "emails," newspaper articles, and other documents precluded summary decision. In support of his response, Sola attached voluminous documents, including the documents identified above, as well as "summaries" of evidence, various IBM documents, and the affidavits of Fang-Pai Chen and Kevin McInerney.

The administrative law judge (ALJ) subsequently rendered his "Recommended Order and Decision." He determined that Sola had made a *prima facie* case of age discrimination and, further, that IBM had set forth a legitimate, nondiscriminatory reason for its decision to surplus Sola, *i.e.*, Sola's skills were less necessary to the Team than those of the members who were retained. The ALJ concluded, however, that Sola failed to demonstrate a genuine issue of material fact on the

---

[2]Miron had left the company in June. Also, apparently, Whitlock was not assessed because she was the Team leader.

question of whether IBM's articulated reason for designating him as surplus was pretextual and, accordingly, recommended granting IBM's motion for summary decision. Sola sought review of the ALJ's decision before the Commission.

The Commission adopted and affirmed the ALJ's decision. The Commission rejected Sola's argument that the ALJ utilized an improper test in determining whether Sola had demonstrated a genuine issue of material fact, but agreed with the ALJ that Sola had made a *prima facie* case of age discrimination and that IBM had set forth a legitimate, nondiscriminatory reason for "surplusing" Sola.

On appeal, the parties initially disagree on the standard of review. Sola and the Commission contend that the standard is *de novo*, relying on *Tate v. American General Life & Accident Insurance Co.*, 274 Ill. App. 3d 769, 655 N.E.2d 18 (1995). IBM, on the other hand, contends that the standard of review is against the manifest weight of the evidence pursuant to section 8—111(A)(2) of the Act (775 ILCS 5/8—111(A)(2) (West 1998)), and relies on *Cano v. Village of Dolton*, 250 Ill. App. 3d 130, 620 N.E.2d 1200 (1993).

■ Pursuant to the Code, an ALJ shall render summary decisions "without delay if the pleadings and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving Party is entitled to a Recommended Order as a matter of law." 56 Ill. Adm. Code § 5300.735(b) (2000). This court has previously held that a "summary decision is the administrative agency procedural analogue to the motion for summary judgment in the Code of Civil Procedure." *Cano*, 250 Ill. App. 3d at 138. Thus, "[b]ecause of the similarities of the two, it would seem appropriate to employ the case law which has grown out of the summary judgment motion practice when reviewing the propriety of such an order on direct review." *Cano*, 250 Ill. App. 3d at 138. Although summary judgments are reviewed *de novo* (*Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 30, 719 N.E.2d 756 (1999)), two districts of the appellate court have disagreed on the standard of review for summary decisions.

In *Cano*, the First District held that the standard of review is against the manifest weight of the evidence, pursuant to the dictates of the Act. 775 ILCS 5/8—111(A)(2) (West 1998). Section 8—111(A)(2) of the Act provides: "In any proceeding brought for judicial review, the findings of fact made at the administrative level shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence." 775 ILCS 5/8—111(A)(2) (West 1998). However, the Third District disagreed with *Cano*'s holding. In *Tate*, the Third District held that the proper standard of review is *de novo*, finding that *Cano* incorrectly applied the standard of review for

factual questions, the manifest weight of the evidence, to legal questions. *Tate*, 274 Ill. App. 3d at 774-75. According to *Tate*, summary decision, like summary judgment, "requires [that] a decision be entered in favor of the moving party if there is no genuine issue as to any material fact and if the moving party is entitled to a decision in its favor as a matter of law." *Tate*, 274 Ill. App. 3d at 774. Because this is a legal determination, not a factual determination, *de novo* review applies. Further, the *Tate* court noted that *Cano* erroneously relied upon section 8—111(A)(2) because that section, too, relates to factual findings of the Commission where a manifest weight of the evidence standard does and should apply. *Tate*, 274 Ill. App. 3d at 774-75.

While we note that we are not bound by another district's decision, we find *Tate* better reasoned and decline to follow *Cano*. First, *Cano* conducted no analysis; it merely cited to section 8—111 and stated that its review was based upon a manifest weight of the evidence standard. While *Cano*, 250 Ill. App. 3d at 138, highlighted the term "any," in "In any proceeding" in section 8—111(A)(2), it ignored the language following this phrase that the Commission's "findings of fact" were subject to a manifest weight of the evidence standard of review. 775 ILCS 5/8—111(A)(2) (West 1998). Section 8—111(A)(2) contains no language about findings of law. Moreover, a grant of summary decision, based on the language utilized in the Code, clearly is not a question of fact. Rather, the Code employs the same language utilized for summary judgment—"as a matter of law." *Tate*, unlike *Cano*, recognized the difference between questions of law and questions of fact. Thus, *Tate* was correct in concluding that section 8—111(A)(2) was not applicable.

Additionally, Sola concedes we have jurisdiction pursuant to the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1998)), specifically section 3—113 (735 ILCS 5/3—113 (West 1998)). Therefore, all relevant provisions of the Administrative Review Law apply, including section 3—110, which provides that the Administrative Review Law "extend[s] to all questions of law and fact" and that the "findings and conclusions of the administrative agency on *questions of fact* shall be held to be prima facie true and correct." (Emphasis added.) 735 ILCS 5/3—110 (West 1998). On administrative review, questions of fact are reviewed with deference and subject to a manifest weight of the evidence standard. Conversely, on review, questions of law are given no deference and subject to a *de novo* standard of review. See *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204-05, 692 N.E.2d 295 (1998); *Branson v. Department of Revenue*, 168 Ill. 2d 247, 254, 659 N.E.2d 961 (1995); *Envirite Corp. v Illinois Environmental Protection Agency*, 158 Ill. 2d 210, 214, 632 N.E.2d

1035 (1994); *City of Freeport v. Illinois State Labor Relations Board*, 135 Ill. 2d 499, 507, 554 N.E.2d 155 (1990).

For the foregoing reasons, we find that the applicable standard of review for summary decision is *de novo*.

Sola next contends that the ALJ improperly applied the indirect method of proof, set forth in *McDonnell Douglas Corp. v Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973) (*McDonnell Douglas*), in assessing his case and concluding he failed to establish a material question of fact as to pretext. Sola argues that this standard is no longer applicable in light of *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993), and *Troupe v. May Department Stores Co.*, 20 F.3d 734 (7th Cir. 1994), because plaintiffs can now prove their cases circumstantially, "without respect to" the *McDonnell Douglas* test. He contends the facts of his case more than meet the *Troupe* standard.

IBM responds that the *McDonnell Douglas* test is still viable as confirmed by *Illinois J. Livingston Co. v. Human Rights Comm'n*, 302 Ill. App. 3d 141, 704 N.E.2d 797 (1998). IBM contends that *Hicks* did not change a plaintiff's burden. The Commission agrees, arguing that the pertinent analysis is that outlined in *McDonnell Douglas* and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981). The Commission further argues that there is nothing in *Hicks* that states it abandoned the *McDonnell Douglas* test. Instead, the Commission maintains that the *Hicks* court added a caveat that even if an employer's reason is shown to be pretextual, the plaintiff must still demonstrate that the employer's conduct was a result of unlawful discrimination. The Commission also argues that *Troupe* merely addressed the type of evidence that may create a triable issue of fact, and not a separate standard of analysis, as Sola argues.

■ Intentional discrimination can be shown by one of two methods: (1) direct evidence or (2) indirect evidence (the *McDonnell Douglas* test). Under the *McDonnell Douglas* test, as explained by *Burdine* and *Hicks*, and as adopted by the Illinois Supreme Court in *Zaderaka v. Human Rights Comm'n*, 131 Ill. 2d 172, 178-79, 545 N.E.2d 684 (1989), a plaintiff can utilize indirect evidence to sustain his or her case of unlawful discrimination. Under this approach, the plaintiff must first establish by a preponderance of the evidence a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 36 L. Ed. 2d at 677, 93 S. Ct. at 1824. This *prima facie* case creates a presumption that the employer engaged in unlawful discrimination. *Hicks*, 509 U.S. at 506, 125 L. Ed. 2d at 416, 113 S. Ct. at 2747, citing *Burdine*, 450 U.S. at 254, 67 L. Ed. 2d at 216, 101 S. Ct. at 1094. The burden then

shifts to the employer to articulate some legitimate, nondiscriminatory reason. *McDonnell Douglas*, 411 U.S. at 802, 36 L. Ed. 2d at 678, 93 S. Ct. at 1824. The employer has only the burden of production, not the burden of persuasion on this element. *Burdine*, 450 U.S. at 254, 67 L. Ed. 2d at 216, 101 S. Ct. at 1094; *Zaderaka*, 131 Ill. 2d at 179 ("articulate, not prove"). Once the employer has articulated a legitimate, nondiscriminatory reason for its action, the inference of discrimination disappears (*Hicks*, 509 U.S. at 507-08, 125 L. Ed. 2d at 416, 113 S. Ct. at 2747), and the plaintiff must establish by a preponderance of the evidence that the employer's reason was not a true reason but, rather, a pretext. *McDonnell Douglas*, 411 U.S. at 804, 36 L. Ed. 2d at 679, 93 S. Ct. at 1825. In other words, the plaintiff must show that the proffered reason was a cover-up for a discriminatory reason. *McDonnell Douglas*, 411 U.S. at 805, 36 L. Ed. 2d at 679, 93 S. Ct. at 1826. To prove pretext, the plaintiff must show that the employer's reason was false and that discrimination was the real reason for the action. *Hicks*, 509 U.S. at 515, 125 L. Ed. 2d at 421, 113 S. Ct. at 2751-52. At this point, a " ' "new level of specificity" ' " is required. *Illinois J. Livingston*, 302 Ill. App. 3d at 154, quoting *Hicks*, 509 U.S. at 516, 125 L. Ed. 2d at 422, 113 S. Ct. at 2752, quoting *Burdine*, 450 U.S. at 255, 67 L. Ed. 2d at 216, 101 S. Ct. at 1095. The plaintiff must show: (1) the articulated reason has no basis in fact; (2) the articulated reason did not actually motivate the employer's decision; or (3) the articulated reason was insufficient to motivate the employer's decision. *Kier v. Commercial Union Insurance Cos.*, 808 F.2d 1254, 1259 (7th Cir. 1987). See *Hughes v. Brown*, 20 F.3d 745, 747 (7th Cir. 1994).

In *Troupe*, the court set forth what has now apparently become an alternative method of proof in the Seventh Circuit.[3] Under the direct approach, the plaintiff can establish his or her case with either direct

---

[3]Although the issue is somewhat muddled, most recent Seventh Circuit decisions have indicated that the circumstantial evidence analysis espoused in *Troupe* is one method of proof under the direct evidence method. See *Maldonado v. United States Bank*, 186 F.3d 759, 763 (7th Cir. 1999); *Marshall v. American Hospital Ass'n*, 157 F.3d 520, 525 (7th Cir. 1998); *Pafford v. Herman*, 148 F.3d 658, 665 (7th Cir. 1998); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722-23 (7th Cir. 1998). See also *Bickerstaff v. Nordstrom, Inc.*, 48 F. Supp. 2d 790, 796 (N.D. Ill. 1999) (noting two approaches and stating *Troupe* part of direct evidence method). But see *Robin v. ESPO Engineering Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000) (identifying direct and indirect evidence and indicating *Troupe* falls within indirect at which time it is best to utilize *McDonnell Douglas* test); *Council 31, American Federation of State, County & Municipal Employees v. Doherty*, 169 F.3d 1068, 1072 (7th Cir. 1999) (citing only *Troupe* test and failing to mention *McDonnell Douglas*).

or circumstantial evidence. The Seventh Circuit in *Troupe* stated there were three kinds of circumstantial evidence the plaintiff could utilize to meet his or her burden. Each may be sufficient by itself or used in combination to defeat summary judgment. *Troupe*, 20 F.3d at 736. First, there is evidence of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe*, 20 F.3d at 736. Second, there is "evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic *** on which an employer is forbidden to base a difference in treatment received systematically better treatment." *Troupe*, 20 F.3d at 736. Third, there is "evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Troupe*, 20 F.3d at 736.

Either the *McDonnell Douglas* or *Troupe* test, or both, may be employed by a particular plaintiff in proving his case. *Maldonado*, 186 F.3d at 763. Also, under either test, the plaintiff must present sufficient evidence to allow a jury to infer that age was a motivating factor in the employer's decision. *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1350 (7th Cir. 1995). Whatever the test, the burden of persuasion always remains on the plaintiff. *Burdine*, 450 U.S. at 256, 67 L. Ed. 2d at 217, 101 S. Ct. at 1095.

Thus, based on the recent Seventh Circuit decisions, there are two methods to prove discrimination. For purposes of the case at bar, we analyze Sola's evidence under both tests since he has in fact argued that the *Troupe* method is applicable.

■ To defeat a summary decision, "[a]ll that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because the latter was a member of a protected class." *Troupe*, 20 F.3d at 737. In other words, there must be evidence from which the trier of fact could infer that the rea-

---

Confusion exists because the third *Troupe* category is substantially the same as that evidence required by *McDonnell Douglas*. *Marshall*, 157 F.3d at 525 n.1; *Huff v. UARCO Inc.*, 122 F.3d 374, 380 (7th Cir. 1997).

Of the other federal circuits to mention *Troupe*, only one has analyzed the case in this regard. See *Armstrong v. Flowers Hospital*, 33 F.3d 1308, 1313-14 (11th Cir. 1994) (combining two approaches; first step in a claim of disparate treatment based on pretext and supported by circumstantial evidence is to establish a *prima facie* case and the balance of the *McDonnell Douglas* method).

son given by the employer was pretextual. *Senner v. Northcentral Technical College*, 113 F.3d 750, 755 (7th Cir. 1997).

Sola contends that all three types of circumstantial evidence, under the direct evidence method discussed in *Troupe*, exist in the instant case, although he does not outline or discuss them separately. He argues that this circumstantial evidence was sufficient to preclude summary decision. Sola further argues that the ALJ and Commission ignored, minimized, or confused the evidence he presented, as discussed more fully below.

IBM contends that Sola failed to present any admissible evidence to support his arguments and, therefore, failed to show its articulated reason for designating Sola as surplus was unworthy of credence. The Commission contends that Sola failed to prove IBM's stated reason was not the real reason for his designation as surplus—something Sola must prove before proving the reason was, in fact, discriminatory. The Commission adopts IBM's arguments in all other respects.

Sola maintains that systematic disparate treatment[4] and disparate impact[5] evidence may be used to prove pretext. According to Sola, such evidence may be used to show that IBM engaged in systematic age discrimination in the Midwest region and, therefore, to prove that IBM's reason was in reality discriminatory. Sola argues that the ability to utilize this method of proof was "missed" by the ALJ and Commission, as well as the fact that the Commission ignored all disparate treatment evidence, including that: as early as 1992 IBM targeted older employees in the Midwest area; the change in severance policy was announced in September 1994 immediately preceding the reduction in force; Chen and McInerney submitted evidence that they were forced out due to their age; two other employees, Holland and Kjos, were forced out due to age; when Sola, Chen, Holland, and Kjos were forced out of the retail store unit, younger employees replaced them;

---

[4]Systematic disparate treatment occurs when an employer "simply treats some people less favorably than others" because of age. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609, 123 L. Ed. 2d 338, 346, 113 S. Ct. 1701, 1705 (1993).

[5]Systematic disparate impact evidence exists when "a specified employment practice, although neutral on its face, has a disproportionally negative effect on members of a legally protected class." *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir. 1996). See also *Noreuil v. Peabody Coal Co.*, 96 F.3d 254, 259 (7th Cir. 1996). However, "if [a] practice is found to be justified by business necessity, the [age discrimination] claim will fail." *Equal Employment Opportunity Comm'n v. Francis W. Parker School*, 41 F.3d 1073, 1076 (7th Cir. 1994) (*EEOC*). Decisions based on criteria that tend to affect older workers more are not prohibited. *EEOC*, 41 F.3d at 1077.

Chen stated the same thing was happening to other employees throughout the Midwest region; the three individuals designated surplus from the Team were all 40+ and no one under 40 was designated surplus; McInerney noticed that older employers were ranked lower than younger employees; and the company was hiring people at the time of Sola's designation as surplus, yet it could find no other position for him. Sola also contends that the disparate impact model can be used to undermine an employer's articulated reason.

IBM contends that any alleged systematic disparate impact evidence does not aid Sola because such evidence is not probative of age discrimination. IBM urges us to adopt the findings of *Blackwell v. Cole Taylor Bank*, 152 F.3d 666 (7th Cir. 1998), and *EEOC*, which rejected the use of such a theory in age discrimination cases.

■ Disparate impact evidence is not available as a theory to demonstrate age discrimination in the Seventh Circuit. See *Diettrich v. Northwest Airlines, Inc.*, 168 F.3d 961, 966 (7th Cir. 1999); *Blackwell*, 152 F.3d at 672. See also *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 400 (7th Cir. 1998) ("Our court generally has not found that statistical evidence concerning terminated employees, without more, is relevant to our analysis of whether the articulated reasons for discharging *this* plaintiff were pretextual or discriminatory" (emphasis in original)); *Gehring v. Case Corp.*, 43 F.3d 340, 342 (7th Cir. 1994) (fact that reduction in force had disparate impact on older employees is not a theory of age discrimination cognizable in the Seventh Circuit). However, even assuming either disparate treatment or disparate impact evidence would be admissible to establish that an employer favored younger employees, which in turn could buttress a plaintiff's claim that his employer's articulated reason was due to age (*Diettrich*, 168 F.3d at 966; *Gehring*, 43 F.3d at 342; *EEOC*, 41 F.3d at 1078), such evidence does not support Sola because a majority of the evidence which Sola contends was ignored is contained in Chen's and McInerney's affidavits. Those affidavits alleged that the affiants were the subject of age discrimination and that, over several prior years, the affiants observed IBM targeting and getting rid of "senior (older)" employees. These affidavits were of little value because most of the averments were not factual, nor were they supported by facts; rather, they were conclusory. Moreover, some of the averments were based on hearsay. Therefore, the affidavits did not comply with Supreme Court Rule 191 (145 Ill. 2d R. 191). See also *Jones v. Dettro*, 308 Ill. App. 3d 494, 499, 720 N.E.2d 343 (1999). In fact, most of the evidence Sola points to is not supported by specific factual averments. Sola's disparate impact or treatment evidence simply does not give rise to an inference of discrimination.

■ Sola next contends that the Commission improperly ignored statistical evidence and the opinion of his expert, Dr. David Drehmer. He further contends that the sample size of the evidence was sufficient for the Commission to rely upon in finding age discrimination by IBM. IBM contends that the sample size was too small and that Drehmer himself admitted that the data was insufficient to determine whether IBM engaged in age discrimination.

The Commission found that Sola's own expert stated that the statistical evidence could not be used to justify a finding of discrimination. The Commission also concluded that the statistical evidence was not statistically significant because the sample size was too small.

Statistical evidence must be relevant and significant. R. Mariani & K. Robertson, *Age Discrimination Litigation: RIFs, Statistics and Stray Remarks*, 64 Def. Couns. J. 88, 92 (1997). Statistics are relevant if the plaintiff "establishes a connection between the statistics, the practices of the employer and the employee's case." 64 Def. Couns. J. at 92. Statistical evidence is significant if the statistical disparity is "large enough to give rise to an inference that the employer's decision was based on *** age" and the sample is large enough to have some predictive value. 64 Def. Couns. J. at 92. Nonetheless, the probative value of statistical evidence in demonstrating discrimination against an individual is low. *Bickerstaff*, 48 F. Supp. 2d at 802; *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579, 57 L. Ed. 2d 957, 968-69, 98 S. Ct. 2943, 2950-51 (1978).

In the instant case, Sola's expert specifically stated:

"[T]he numerical data [presented in the IETP documents] cannot be used to justify a finding of discrimination or non-discrimination. Without knowing the density of persons at each level, it is impossible to determine whether age is or is not related to the decisions of who to keep or who to terminate. The very minimum data that would be necessary to even begin to explore the question of discrimination would include both the ages and the number of persons in each age group who were terminated and who were retained. Ages alone where there is any overlap in age categories cannot be statistically or substantively determinative of age-related practices."

Drehmer then gave a lengthy explanation of the data necessary to render such a determination and the methods to utilize in evaluating it. Clearly, Drehmer did not have sufficient information to render a statistical opinion. If an "expert" does not have sufficient data, the statistics cannot be significant because one cannot ascertain the statistical disparity percentage which is necessary to ascertain whether an inference of discrimination exists. Moreover, if Drehmer did not

have sufficient data to rely upon and base a decision upon, how could the Commission, which presumably is not an expert in statistical correlation, have sufficient data upon which to rely? The data offered by Sola simply did not meet the requirements for relevancy and significance.

■ Sola next contends that the Commission ignored "abundant" evidence of ageist stereotypes by the decision makers, Heideman, Whitlock, and Kupczyk. Sola directs our attention to specific comments made by these individuals. According to Sola, Whitlock said he was "slow" and that he "needed training and doubted he could learn new skills quickly." Additionally, Kupczyk made a comment that Sola believed his position in the ACT Team was temporary until his retirement. She also commented that Sola was slow. According to Sola, these comments demonstrate ageist stereotypes showing that these individuals believed him to be nonproductive (slow), more costly and inflexible (needed training but not able to learn), and looking toward retirement—all common age stereotypes. IBM contends that none of the statements relied upon by Sola are probative of age discrimination.

"[T]o have probative value, remarks must be 'age-related' and 'relevant.' " 64 Def. Couns. J. at 94. The comments must have been made contemporaneously with the employer's decision or be causally related to the decision. *Marshall v. American Hospital Ass'n*, 157 F.3d 520, 526 (7th Cir. 1998). Ambiguous comments refer to "isolated comments" that may support an inference of discrimination even though the statements are not directly discriminatory themselves. *Bickerstaff*, 48 F. Supp. 2d at 797. Stray remarks, "including isolated statements, statements by non-decision makers, or statements by decision makers unrelated to the decisional process itself, are insufficient to establish discrimination." 64 Def. Couns. J. at 94. Vague or ambiguous comments do not give rise to an inference of discrimination. 64 Def. Couns. J. at 94.

The Commission determined the remarks relied upon by Sola were not "necessarily age based remarks." We agree. None of the comments identified by Sola mention or refer to age. Simply referring to someone as slow in performing his or her work does not equate to discrimination based on age. See *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) (comment that the plaintiff "moved in slow motion" at most referred to a characteristic sometimes associated with age). There is no evidence that Whitlock or Kupczyk ever referred to Sola's age or stated he was old. This case is distinguishable from *Holmes v. Marriott Corp.*, 831 F. Supp. 691, 707 (S.D. Iowa 1993), where the management commented that the plaintiff was "too old to do the job"

and was "not as young as he used to be," which comments were found to create an inference of age discrimination. Similarly, the fact that Sola required additional training and did not have the skills to learn the requisite knowledge in the time period necessary does not demonstrate age discrimination. Again, there was no reference to Sola's age or that he was old.

Moreover, Sola failed to identify any time frame in which the comments were made. There is no evidence whether they were made in the spring, summer, or fall of 1994. Thus, it cannot be inferred that the comments were made contemporaneously with the decision to surplus him. Further, there is no evidence to tie any of these comments to IBM's decision to designate Sola as surplus. See *Jones v. City of Elgin*, No. 96 C 6920, (N.D. Ill. May 13, 1998). Therefore, it cannot be inferred that a causal relationship existed between the comments and IBM's decision.

In summary, we find that the comments identified by Sola were stray remarks that he failed to connect to age discrimination or IBM's decision to "surplus" employees, in particular, himself.

■ Sola also contends that there was abundant evidence which the Commission ignored, casting doubt on IBM's articulated reason based on the lack of credibility of IBM's witnesses and the discrepancies in its evidence. He relies on the following evidence: the managers did not base the reduction in force choice on the IETP stated seniority factor; at the time Sola was designated as surplus, the Team was hiring younger employees but IBM could find no other position for him; Sola completed 66 large system configurations over six months but IBM stated he needed training to perform such work; when Sola was placed in the unit, a manager was excited to have him because of his knowledge and experience; the managers acknowledged the Team as the best and brightest; Sola was given no formal performance appraisal and, therefore, his exceptional performance could not be fully documented; Sola performed above average; Sola received compliments from his managers who were at the same time ridiculing him to others; the growth and revenue of the Team exceeded that of the company; older employees on the Team were given time-consuming projects that decreased their productivity; Whitlock admitted she targeted McInerney for termination by giving him the log work; IBM had no white collar employees over the age of 62; Sola was the oldest member of the Team; the managers made the Team believe it was not part of the reduction in force; IBM claimed Sola was not part of the reduction in force, yet gave him information and documents related thereto; Sola was told to take vacation time during the period in which the managers were evaluating the Team; and when Sola was placed on

the Team, Whitlock told McInerney that Sola was a "short term problem." According to Sola, the ALJ clearly made credibility determinations and did not view the evidence in a light most favorable to him, and the ALJ broke the evidence into small pieces rather than viewing it as a whole.

IBM argues that Sola's self-perception of his abilities and qualifications was insufficient to support a finding of a pretextual reason. IBM further argues that Sola's expertise was based on outdated technology that was not pertinent to the Team's missions. IBM also maintains that the fact Sola received compliments on his work had no impact upon the fact that he was assessed based on his comparative skills. IBM further argues that the fact it believed Sola was doing an adequate job does not equate to a pretextual reason for designating him surplus.

A majority of the evidence relied upon by Sola in support of his argument is irrelevant to the reduction in force and IBM's decision to surplus Sola. While Sola argues there is a dispute as to whether he was "terminated" due to the reduction in force, it is clear from the record that because he was surplused, which was the term utilized in the plan, he was part of the reduction in force and this was the basis for his eventual retirement and leaving the company. In any event, the evidence showed that Sola was designated surplus based on his skills as compared to other members of the unit; the evidence showed that Sola's skills were among the weakest of all the Team members. Therefore, the facts that Sola may have completed large system configurations, managers praised him, he was given no formal performance review, he believed he performed above average, he was assigned log work, and he took vacation time are not pertinent to his claim. Similarly, while the "IETP: Notice to Employees, Age and Title Information" document included seniority as a factor in determining which employees would be designated surplus (*i.e.*, "total assessment of such factors as skill needed for IBM's current and changing environment, performance, seniority, and the elimination of work and positions"), the original document dated September 8, 1994, detailing the reduction in force stated that the decision was within the manager's discretion based on the *"skills necessary for that particular unit."* (Emphasis added.) The document relied upon by Sola was created after the decisions for the entire company had been made, not prior to any decisions. Those individuals with the weakest comparative skills were to be designated surplus. This is precisely what happened to Sola.

Additionally, while it may be true that the Team was growing and was unable to complete its work, IBM nonetheless targeted it for reduction. This was IBM's decision and it is not for this court to

substitute our business judgment for IBM's. *Spillyards v. Abboud*, 278 Ill. App. 3d 663, 681, 662 N.E.2d 1358 (1996). Moreover, Sola failed to present any evidence that the reduction in force was instituted because of age. Conversely, the Team was targeted for reduction because it had too many employees with skills that were not consistent with those necessary for the unit's work, *e.g.*, large system configuration. Lastly, contrary to Sola's contention, there was no evidence that the Team was hiring individuals at the time he was designated surplus.

In conclusion, the circumstantial evidence here, pursuant to *Troupe*, which was admissible and relevant, taken as a whole, was insufficient to give rise to an inference of age discrimination. The evidence simply did not show that IBM's articulated reason had no basis in fact, did not actually motivate IBM's decision, or was insufficient to motivate IBM's decision. Thus, the evidence did not demonstrate a pretext for age discrimination.

■ With respect to proving age discrimination based on indirect evidence, Sola was required to meet the three-prong test of *McDonnell Douglas*. Neither IBM nor the Commission disputes the ALJ's finding that Sola established a *prima facie* case of age discrimination. Therefore, we need not address this issue. Further, IBM articulated a legitimate, nondiscriminatory reason for designating Sola surplus: his assessed skills were comparatively among the weakest of the Team. Therefore, the only element at issue is whether Sola presented sufficient evidence to create a triable issue of fact on the question of pretext. As indicated in footnote 3 of this opinion, the analysis and standards are the same for *McDonnell Douglas* as for the third type of circumstantial evidence under the *Troupe* test, which were addressed cumulatively above. Because we concluded that Sola's circumstantial evidence, taken as a whole, was insufficient to create a question of fact regarding pretext for age discrimination, we also conclude that Sola failed to meet the third prong of *McDonnell Douglas*.

Accordingly, based on either the direct or indirect evidence method, summary decision was properly entered dismissing Sola's complaint based on Sola's failure to present evidence from which an inference could be drawn that IBM's articulated reason was a pretext for age discrimination.

■ Sola next contends that the ALJ erred in holding that no case law supported his position that IBM's failure to adhere to a seniority-based reduction in force was evidence of a pretextual reason. Sola maintains that he was the most senior member of the Team, but there is no evidence that IBM considered this. According to Sola, IBM stated in the IETP that it was to consider seniority in the surplusing decision. Sola relies on *Huff v. UARCO, Inc.*, 122 F.3d 374 (7th Cir. 1997),

in support of his argument. IBM contends that its decision to not base the reduction in force on seniority was not evidence of a pretextual reason because IBM was not required to base such a decision on seniority.

*Huff* does not support Sola's argument. In *Huff*, the company manual mandated that all reductions in force be based on seniority with bumping rights. In the instant case, there clearly were no bumping rights. Also, as discussed above, seniority was mentioned after the decisions of which employees were to be surplused had been made. The law is clear that employers are not required to, nor need they, consider seniority in making employment decisions, including reductions in force. *Coleman v. Navistar International Transportation Corp.*, No. 93 647 (N.D. Ill. July 26, 1996). See also *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1217 (7th Cir. 1985).

Finally, Sola contends that the Commission misapplied reduction-in-force case law. According to Sola, even if he was released due to a reduction in force, which he contends was disputed, an employer, here IBM, can be challenged on its failure to consider an employee, here Sola, for other positions.

Again, the law is clear that employers need not transfer employees to another position or find them another job in a reduction of force situation. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 615 (7th Cir. 2000). Thus, this argument fails.

For the reasons stated, we affirm the decision of the Commission.

Affirmed.

CERDA and WOLFSON, JJ., concur.