2025 IL App (1st) 241263-U

No. 1-24-1263

Order filed September 15, 2025

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| MICHAEL KENNEDY, | ) | Petition for Review of an Order |
| | ) | of the Illinois Human Rights |
| Petitioner, | ) | Commission. |
| | ) | |
| v. | ) | Charge No. 2019 CF 0022 |
| | ) | |
| THE ILLINOIS HUMAN RIGHTS COMMISSION, THE | ) | |
| DEPARTMENT OF HUMAN RIGHTS, NEW TRIER | ) | |
| TOWNSHIP HIGH SCHOOL DISTRICT 203, and | ) | |
| NORTHFIELD NEW TRIER HIGH SCHOOL, | ) | |
| | ) | |
| Respondents. | ) | |

_____

JUSTICE COBBS delivered the judgment of the court.
Justices Howse and Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the Illinois Human Rights Commission's summary decision where petitioner failed to establish a *prima facie* case of retaliation.

¶ 2    Petitioner Michael Kennedy appeals the Illinois Human Rights Commission's (Commission) summary decision in favor of his former employer, New Trier Township High School District 203 (District), finding Kennedy failed to establish a *prima facie* case of retaliation.

On appeal, Kennedy argues the Commission erred in granting the summary decision because he sufficiently alleged a claim of retaliation and raised a genuine issue of material fact. We affirm.

¶ 3    On July 11, 2018, Kennedy filed a charge of discrimination with the Department of Human Rights (Department) pursuant to the Illinois Human Rights Act (Act) alleging the District retaliated against him after he complained to the District's director of human resources on June 13, 2018, that he "was being discriminated [against] in the workplace." See 775 ILCS 5/6-101(A) (West 2018) (retaliation for opposing unlawful discrimination is a civil rights violation). He stated, "The negative employment action followed my protected activity within such a period of time as to raise an inference of retaliatory motivation."

¶ 4    The Department initially dismissed the charge for lack of substantial evidence, but the Commission vacated the dismissal and remanded the charge for further investigation. After the Department dismissed the charge a second time, the Commission again vacated the dismissal and remanded with instructions to enter a finding of substantial evidence. The Department then issued a notice of substantial evidence and filed a complaint on Kennedy's behalf with the Commission.

¶ 5    Following discovery, the District moved for summary decision. It attached a transcript of Kennedy's deposition testimony and an affidavit by Stephanie Helfand, the District's chief technology officer and manager of Kennedy's department.

¶ 6    The following background is taken from, *inter alia*, the complaint, the District's motion for summary decision, Kennedy's response, and attachments to the parties' filings.

¶ 7    In December 2017, the District hired Kennedy as a user support specialist in its technology department. For the first year of employment, he was considered a probationary employee.

¶ 8    On June 13, 2018, Kennedy sent an email to George Sanders, the District's director of human resources, reporting that Michael Janik, a contractor and interim manager, had made two racially inappropriate comments at unspecified times. Kennedy stated in relevant part:

"[U]pon finding out that I lived in Cicero, [Janik] decided to tell me a story about someone he knew who was arrested for a DUI in Cicero. He said they took him to the lockup, where it was full of blacks or black guys (I believe he said the former, but I'm not positive). Janik said the police put his friend in a separate cell (I assume he was white) and would walk by during the night and taunt him etc. I guess Janik thought this was funny. Clearly he was not aware I am married to an African American woman and have 4 biracial children. *** [This was] very inappropriate.

He also made an ethnic crack about me when I was at Northfield. We had our normal meeting that morning ***. I didn't think anything was particularly heated about it, I doubt anyone else did. Later that day he thought it was appropriate to make a crack to me about the Irish and their inability to control their tempers. I happen to have been born in Belfast in the north of Ireland and don't particularly enjoy Irish ethnic stereotypes."

¶ 9    On June 14, 2018, Sanders notified Kennedy via email that he was suspended without pay through July 16, 2018, at which time Sanders would recommend the District's board of education terminate Kennedy's employment. Sanders also noted Kennedy's first year of employment was probationary.

¶ 10    On July 6, 2018, Sanders emailed Kennedy the results of his investigation into Kennedy's complaint against Janik, including corrective measures taken. Sanders stated Janik "was advised

to maintain a professional demeanor in the workplace," Janik was willing to apologize to Kennedy, and Janik's contract with the District had expired in June.

¶ 11    On July 13, 2018, Kennedy resigned, stating he "already found other employment."

¶ 12    At his deposition, Kennedy testified that he believed Helfand "was looking for an excuse" to replace him as early as April 2018 because he had continued speaking to supervisor Moira Gitau, with whom Helfand "had a major falling out." He described Janik's story about the jail in Cicero as a joke, and said he knew Janik "thought it was funny" because he was "smirking." Kennedy said he "probably" told two or three of his coworkers about the comments. He also said, "I know I mentioned it to Moira [Gitau] at some point, but I don't remember when I did that." He did not recall her response, and he had not expected her to do anything about it. Kennedy told the same two or three coworkers about Janik's comment regarding "the Irish." He thought both incidents with Janik occurred around March 2018.

¶ 13    Kennedy stated that, "more than a week" before his June 13, 2018, complaint to human resources, he discussed Janik's comments with the president of the staff union, who first said that reporting the comments "would be a waste of time," then changed her mind and told him to report them. On June 13, 2018, Kennedy and the union president met with Sanders to discuss his complaint, and Sanders assured Kennedy there would be no retaliation against him.

¶ 14    Then on June 14, 2018, Kennedy met with Helfand to discuss his year-end evaluation, which scored Kennedy "below expectations" on teamwork and professionalism and narrated examples of his critical, negative, and aggressive behavior toward colleagues. Kennedy disputed the evaluation as "outright falsification." He further testified that at the meeting, Helfand informed

him he was being suspended without pay pending termination, and security escorted him from the building.

¶ 15    In her affidavit, Helfand attested that a manager reported to her that, during a conference call in the week of January 29, 2018, Kennedy "raised his voice and used an aggressive tone." Helfand also personally witnessed Kennedy raise his voice and speak aggressively toward the same manager in a subsequent meeting. Then, during the week of April 30, 2018, Janik told Helfand that Kennedy had spoken aggressively to him, criticized his management of a project, and told him he was incompetent, ineffective, did not know how to do his job, and was "the worst" manager.

¶ 16    On May 4, 2018, Helfand witnessed Kennedy interrupt a meeting to speak negatively and aggressively about Janik. That same day, Kennedy "behaved aggressively" toward Helfand; that is, he raised his voice, accused her of lying, and sent an email stating, "The schedule Mike Janik shared with you only bears a passing resemblance to reality." Helfand described this email—which she attached as an exhibit to her affidavit—as "unprofessional." Helfand further attested she "was informed" that Kennedy confronted Janik regarding Janik's report of Kennedy's unprofessional behavior. Helfand stated other technology department staff told her it was "well-known" that Kennedy disliked Janik, but those staff members did not share Kennedy's concerns about Janik's competence. She met with Kennedy "on multiple occasions" to review the District's expectations of professionalism.

¶ 17    Helfand stated, "Based on Mr. Kennedy's ongoing performance issues, as of May 2018, I made the decision to recommend Mr. Kennedy's dismissal effective for the end of the school year." To minimize disruption, she decided to wait until his final evaluation to notify him of her dismissal recommendation. Helfand "was informed," however, that on June 11 or 12, 2018, Kennedy told

another employee that "Thursday was his last day," referring to June 14, 2018, the day of his final evaluation.

¶ 18    Helfand stated she met with Kennedy for his final evaluation on June 14, 2018. At the meeting, she informed him of her dismissal recommendation. She was not aware that Kennedy had filed a complaint with human resources the day before, and Kennedy did not mention the complaint to her. Kennedy at no point personally reported Janik's racial comments to Helfand.

¶ 19    Helfand attached to her affidavit a text message exchange dated June 11, 2018, in which the District's associate superintendent asked her to provide "the bullet points for Kennedy about why we are terminating." Helfand replied that she would write Kennedy's evaluation that night and send it to the associate superintendent.

¶ 20    In its memorandum in support of its motion for summary decision, the District argued that, based on the above evidence, Kennedy could not establish a claim for retaliation because he resigned before he was discharged and because there was no causal connection between his complaint about Janik and his suspension. It further argued it had provided "ample evidence" that the District's reason for suspending Kennedy was due to poor performance.

¶ 21    Kennedy filed a response in opposition, arguing his suspension without pay constituted an adverse action for purposes of a retaliation claim and that "genuine issues of material fact remain[ed]" regarding whether his protected activity caused his suspension. He attached an affidavit in which he asserted that he never spoke aggressively or raised his voice as Helfand claimed, and that he reported Janik's inappropriate comments to Gitau in March 2018.

¶ 22    The administrative law judge (ALJ) overseeing the case recommended the Commission grant the District's motion for summary decision and enter judgment in favor of the District. It

found that, although Kennedy's June 13, 2018, report to human resources was protected activity and his suspension without pay was an adverse action, Kennedy did not establish a causal connection between the two as required for a claim of retaliation. It noted Kennedy disputed some but not all of Helfand's sworn statements and "rest[ed] on mere general denials that are unsupported by any evidentiary facts," whereas evidence showed Helfand had decided to discharge Kennedy two days prior to his report to human resources. The ALJ thus found Kennedy failed to establish a *prima facie* case for retaliation.

¶ 23    Kennedy filed exceptions to the ALJ's recommendation, asserting he had "established that there is no question that there are genuine issues of material facts" as to each element of a *prima facie* case. He did not cite any evidence or specify what the issues of fact were. The Commission declined further review and adopted the ALJ's recommended order and decision.

¶ 24    Kennedy filed for direct appellate review in this court, arguing again that his complaint sufficiently alleged a claim of retaliation and that a genuine issue of material fact remains. Both the District and the Commission filed responses. Kennedy did not file a reply.

¶ 25    As an initial matter, Kennedy's opening brief fails to comply with the supreme court rules governing appellate briefs. The statement of facts is a mere five sentences and includes no citations to the record and none of the District's evidence. See Ill. S. Ct. R. 341(h)(6) (eff. Oct. 1, 2020) (statement of facts "shall contain the facts necessary to an understanding of the case *** with appropriate reference to the pages of the record on appeal"). Kennedy's argument also includes no discussion of the Commission's decision or the ALJ's reasoning; indeed, he appears to have copied and pasted the argument section of his brief opposing summary decision before the ALJ. As a

result, he continues to argue that his suspension constituted an adverse action—an issue on which the ALJ agreed with him, and which is not in dispute on appeal.

¶ 26    A reviewing court is entitled to briefs that clearly define the issues, cite to authority, and present cohesive arguments. *Bartlow v. Costigan*, 2014 IL 115152, ¶ 52; see also *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 80 ("This court is not a depository in which the burden of argument and research may be dumped."). We may strike a brief and dismiss an appeal for failure to comply with the supreme court rules governing appellate procedure, which are mandatory. *McCann v. Dart*, 2015 IL App (1st) 141291, ¶¶ 12-15. Nonetheless, we proceed to the merits of Kennedy's appeal despite these deficiencies, as we have the benefit of cogent briefs from both the District and the Commission.

¶ 27    The Act prohibits retaliation against an employee for opposing conduct that the employee reasonably and in good faith believes to be unlawful discrimination. 775 ILCS 5/6-101(A) (West 2018). To establish a *prima facie* case for retaliation under the Act, the employee must show (1) he engaged in a protected activity, (2) his employer committed a material adverse act against him, and (3) there was a causal nexus between the protected activity and the adverse act. *Spencer v. Illinois Human Rights Comm'n*, 2021 IL App (1st) 170026, ¶ 40. A short span of time between a protected activity and an adverse action may establish a *prima facie* case. *Hoffelt v. Illinois Department of Human Rights*, 367 Ill. App. 3d 628, 638 (2006). It is "impossible," however, for an employee's protected activity to have *retroactively* caused retaliation. *Stachler v. Board of Education of the City of Chicago*, 2023 IL App (1st) 221092, ¶ 32.

¶ 28    Pursuant to the Act, either party may move for a summary decision in its favor, and the Commission's hearing officer "shall grant" the motion if the pleadings and affidavits show there

is no genuine issue of material fact. 775 ILCS 5/8-106.1(1)-(2) (West 2018); see also 56 Ill. Adm. Code § 5300.735(a)-(b) (eff. Oct. 5, 2010). We review the Commission's grant of summary decision *de novo*. *Sola v. Illinois Human Rights Comm'n*, 316 Ill. App. 3d 528, 536 (2000).

¶ 29    It is uncontested that Kennedy's complaint to human resources was protected activity and his suspension without pay was an adverse action. See *Hoffelt*, 367 Ill. App. 3d at 637-38 (internal complaint is protected activity); see *id.* at 635, 637 (for retaliation claim, an adverse action is one that might dissuade a reasonable worker from making a charge of discrimination).

¶ 30    After reviewing the record, we find Kennedy failed to establish a causal connection between his June 13, 2018, complaint and his June 14, 2018, suspension. Crucially, Kennedy does not dispute that Helfand did not know of Kennedy's complaint when she informed him of his dismissal, that she decided to dismiss him in May 2018, or that text messages show she communicated her decision to the associate superintendent by June 11, 2013—two days prior to his complaint. Rather, he disputes Helfand's allegations of his "aggressive" behavior and points to statements in his affidavit that he told supervisor Gitau about Janik's comments in March 2018.

¶ 31    As the ALJ noted, Kennedy's assertions about reporting the comments to Gitau in March 2018 were self-serving, not supported by other evidence in the record, and contradicted by his own complaint's allegation that his protected activity occurred on June 13, 2018. Moreover, even assuming Kennedy told Gitau about the comments in March 2018, no evidence suggests Helfand ever learned of Janik's comments through Gitau. Kennedy himself does not assert as much. Indeed, in his deposition, he stated he did not expect Gitau to do anything with the information. As nothing in the record connects Gitau's knowledge of Janik's comments to Helfand's decision to dismiss

Kennedy months later, this fact does not help to establish a causal connection between Kennedy's protected activity and his suspension.

¶ 32    We further note that Kennedy stated in his deposition that he believed Helfand was "looking for an excuse" to replace him as early as April 2018 because he continued speaking to Gitau after she and Helfand "had a major falling out," *not* because he complained about Janik. This statement further undermines Kennedy's claim that his reports of Janik's comments caused his suspension.

¶ 33    Accordingly, undisputed evidence shows that Helfand did not know about Kennedy's complaint against Janik before suspending him. An employment decision made prior to an employee's protected activity cannot be retaliatory. See *Stachler*, 2023 IL App (1st) 221092, ¶ 32. As such, Kennedy did not plead sufficient facts to support a causal connection between his complaint and his suspension and thus failed to establish a *prima facie* case of retaliation.

¶ 34    For these reasons, we affirm the Commission's summary decision.

¶ 35    Affirmed.