# Illinois Official Reports

## Appellate Court

---

### *Burns v. Bombela-Tobias*, 2020 IL App (1st) 182309

---

| | |
|---|---|
| Appellate Court Caption | JANICE BURNS, Petitioner, v. ROSE MARY BOMBELA-TOBIAS, Chairperson of the Human Rights Commission; THE HUMAN RIGHTS COMMISSION; JANICE GLENN, Director of Human Rights; THE DEPARTMENT OF HUMAN RIGHTS; and THE DEPARTMENT OF CORRECTIONS, Respondents. |
| District & No. | First District, Sixth Division<br>No. 1-18-2309 |
| Filed | March 27, 2020 |
| Decision Under Review | Petition for review of order of the Illinois Human Rights Commission, No. 2006-CF-2464. |
| Judgment | Affirmed. |
| Counsel on Appeal | Richard J. Gonzalez and Jaz Park, of Law Offices of Chicago-Kent College of Law, of Chicago, for petitioner.<br><br>Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Janon E. Fabiano, Assistant Attorney General, of counsel), for respondents. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.

Justices Cunningham and Harris concurred in the judgment and opinion.

## OPINION

¶ 1 Petitioner Janice Burns appeals from a final order entered by the Illinois Human Rights Commission (Commission), sustaining the recommended decision of an administrative law judge (ALJ). While we think the analysis used by the ALJ and adopted by the Commission failed to fully consider the real issue in this case—whether the Illinois Department of Corrections' (IDOC) claimed reason for terminating Ms. Burns was a pretext for discrimination—the record as a whole supports the Commission's finding. Accordingly, we affirm.

¶ 2                            I. BACKGROUND

¶ 3 Ms. Burns was born in September 1957 and began working for the IDOC in July 1981. In 1999, she was promoted to the position of assistant warden of programs at the IDOC's Illinois Youth Center in Joliet (IYC Joliet), a maximum-security facility for youths in Illinois. Ms. Burns was terminated on September 15, 2005. The letter terminating her gave no reason, stating only that she was an "exempt" employee who served "at the pleasure of the Director."

¶ 4 On February 26, 2007, Ms. Burns filed a complaint with the Commission, alleging that in terminating her employment, the IDOC had unlawfully discriminated against her based on her age (count I) and disability (count II). In count I, Ms. Burns alleged that after years of consistently positive performance evaluations, in which she was always ranked as either "exceptional" or "accomplished," in July 2005 the IDOC suddenly rated her as merely "acceptable"; that the IDOC refused to provide any reason for her termination in September 2005; that at the time of her termination, she was among the IDOC's oldest employees and was about to be eligible for vested pension benefits; that the IDOC retained other employees whose evaluation ratings were lower than hers had been over the years; and that by discharging her, the IDOC treated her less favorably than similarly situated employees who were younger than her.

¶ 5 In count II, Ms. Burns alleged that she suffers from specific medical conditions that constitute covered disabilities under the Illinois Human Rights Act (Act) (see 775 ILCS 5/1-101 *et seq.* (West 2006)); that in January 2005, she suffered an on-the-job injury that caused and/or exacerbated her spinal and knee conditions; and that she took two medical leaves of absence, underwent knee surgery, returned to work on July 11, 2005, with a light-duty restriction, and was still able to perform the essential functions of her position with that reasonable accommodation. Ms. Burns alleged that when she asked why she had been rated "acceptable," her supervisor told her "you haven't been here"; that she advised her supervisor early in September 2005 that she might require an additional knee surgery; and that she was terminated on September 15, 2005, for no reason other than that she was an "at-will" employee. As relief, Ms. Burns sought reinstatement, damages, and an order enjoining the IDOC from further acts of discrimination.

¶ 6        On August 29, 2007, the IDOC responded to interrogatory No. 14, asking it to provide, among other things, reasons for all personnel actions taken against Ms. Burns, including her termination, and to provide any relevant documents. The IDOC provided no narrative response and in reference to documents, its answer said: "See Complainant's personnel file. See Investigation."

¶ 7        In June 2009, when the evidentiary hearing began, ALJ David Brent ruled that "because [the IDOC] failed to make a proper response to interrogatory number 14, they are going to be prohibited from presenting any evidence relating to—I guess I'll call them the actual reasons that may have contributed to the ultimate action of termination." Thus, the first witness, John Rita, was barred from providing any testimony about difficulties that he had in working with Ms. Burns.

¶ 8        On the second day of the hearing, ALJ Brent modified that ruling to allow the IDOC to present evidence as to a specific investigation of Ms. Burns it had conducted that was completed shortly before her termination because the IDOC had specifically referred to and attached documents regarding that investigation in its interrogatory answers. This investigation, which was conducted by the Investigations and Intelligence Division of the IDOC, concerned a meeting that Ms. Burns had on April 21, 2005, with Wells Center staff— substance abuse counselors who had a contract with IYC Joliet. The evidence uncovered in that investigation is discussed later in this background section. The results of the investigation were received by Kurt Friedenauer, the deputy director of the Juvenile Division of the IDOC, on September 12, 2005. Mr. Friedenauer was the person who recommended Ms. Burns's termination. This investigation became the cornerstone of the IDOC's defense at the hearing.

¶ 9        Ms. Burns called Mr. Rita as an adverse witness. Mr. Rita testified that he began working at IYC Joliet in December 2003 as assistant warden of operations and went on to serve as acting warden from July 2004 to July 2005. When he was acting warden, Ms. Burns, who was one of two assistant wardens of programs, reported to him. She supervised the counselors, the clinical section, the mental health department, the psych administrator, the healthcare unit, the individual in charge of leisure-time activities, the records section, and the school.

¶ 10       Mr. Rita recalled that Ms. Burns slipped on ice at IYC Joliet in January 2005 and returned to work in February 2005 with some physical restrictions caused by that accident. Mr. Rita recalled that Ms. Burns had limited mobility and that she either had difficulty with stairs or voiced a concern about having difficulty with stairs. Ms. Burns needed to undergo knee surgery in April 2005 and returned to work in early July 2005. She again had limited leg mobility and voiced concerns that she had difficulty with some stairs. Mr. Rita recalled that while Ms. Burns was on leave, her office was moved upstairs.

¶ 11       Mr. Rita testified that he gave Ms. Burns an "acceptable" performance rating for the period spanning September 2004 to September 2005 and signed that review on August 25, 2005. He acknowledged that from 1999, when she was promoted to assistant warden at IYC Joliet, through 2004, Ms. Burns was rated on her annual review as exceptional (the highest possible of four ratings) one year and as accomplished (the second-highest possible rating) the four other years.

¶ 12       When she returned to work in July 2005, Ms. Burns asked Mr. Rita why she had received a lower rating than in the past. He denied saying, as Ms. Burns had alleged, that it was, "[b]ecause you just haven't been here." His recollection was instead that he told Ms. Burns that he had performance concerns he had not raised with her earlier because she was "gone a

lot of the time." He testified that he did not know that Ms. Burns was going to be terminated until she told him about it.

¶ 13    Mr. Rita agreed that he was aware of "many[,] many employees," including both union and nonunion members, with worse historic performance ratings than Ms. Burns and with significant disciplinary issues who were not fired. Specifically, Mr. Rita agreed that one employee was suspended for five days for improperly rubbing an inmate, another was disciplined for conducting a background check for personal reasons, and a third was suspended for one day for losing paperwork and for three days for intentionally giving false information after discovering a youth had made a comb into a shank.

¶ 14    During cross-examination by the IDOC, Mr. Rita testified about the Wells Center investigation. In April 2005, he received a letter of complaint from Walter Henderson, the lead substance-abuse counselor at the Wells Center, alleging that Ms. Burns had behaved inappropriately during a meeting with him and other counselors. In the letter, Mr. Henderson related that Ms. Burns was "cussing" and threatening the counselors' jobs during the meeting. In response to receiving the letter, Mr. Rita contacted Mr. Friedenauer, who indicated he would have the external investigations unit look into the matter. Mr. Rita also asked Mr. Henderson to get letters from other staff members at the Wells Center documenting what happened at the meeting. Mr. Rita was also allowed to testify that "from time to time" he would get other complaints regarding Ms. Burns that were consistent with the topics of the investigation.

¶ 15    Mr. Rita further testified that he did not recall Ms. Burns ever asking for any accommodations when she returned to work. He recalled that she was accommodated by being left off of duty rotation, which would have required her to tour the housing units and traverse the entire facility to make sure things were in order. He also recalled that there were times when meetings were held in Ms. Burns's office so that she would not have to walk upstairs. Mr. Rita explained that Ms. Burns's office was moved to the second floor because a secretary position had been eliminated, leading to the combination of the two assistant wardens' offices so that one secretary could serve them both.

¶ 16    On redirect examination by Ms. Burns's counsel, Mr. Rita admitted that "on occasion" he had heard IDOC employees use profanity on the job and superiors use profanity to subordinates when criticizing or discussing their job performance.

¶ 17    Ms. Burns also called Mr. Friedenauer as an adverse witness. Mr. Friedenauer testified that in 2004 and 2005, he was deputy director for the Juvenile Division of the IDOC. He knew of Ms. Burns's injury in January, her return in February with work restrictions, her subsequent surgery, and her return to work in July with limitations on her physical mobility. Mr. Friedenauer testified that after Ms. Burns received her performance evaluation in 2005, she called his office and left a message that she was upset with her evaluation. He stated that he never orally gave Ms. Burns a reason for her firing but instead gave her the letter stating that she was an "exempt" employee.

¶ 18    Mr. Friedenauer was aware of employees who had received "unacceptable" ratings on performance reviews, or who had disciplinary issues, yet had not been terminated. When asked about a specific employee, he explained that the individual was subject to the civil service rules of the personnel commission, had recourse rights that a senior public service administrator— such as Ms. Burns—did not, and had exercised his grievance rights to obtain a reversal of his discipline. When asked about another specific employee who was a senior public service administrator and had been rated unacceptable in 2004 and 2005, Mr. Friedenauer agreed that

that individual had been disciplined by being suspended for five days. Regarding a third employee, who had been rated unacceptable and demoted from an assistant warden position to an assistant center supervisor position, Mr. Friedenauer stated, "Well, certainly the standard for an employee with [24] years of experience, I believe, as [Ms. Burns] is, a higher standard than somebody with less experience."

¶ 19 On cross-examination by the IDOC, Mr. Friedenauer testified that the decision to recommend the termination of Ms. Burns's employment "was a result of numerous and ongoing conversations and discussions that [he] had with the then-chief of staff [Salvador Godinez], who also had knowledge of [Ms. Burns] and had similar growing concerns regarding her performance and the disruptiveness of her nature at the facility." Mr. Friedenauer explained that Ms. Burns's name had "started to surface in a variety of very uncomplimentary circumstances" and that his concerns escalated as time went on. Mr. Friedenauer stated that the discussions ended with him recommending that Mr. Godinez in turn recommend to the IDOC's director, Roger Walker, that Ms. Burns be terminated. Mr. Walker concurred, and Ms. Burns was terminated. Mr. Friedenauer testified that the culminating event prior to Ms. Burns's termination was the report from the Wells Center investigation.

¶ 20 On redirect, Mr. Friedenauer admitted that at the time of his meeting with Mr. Godinez, in which he recommended that Ms. Burns be terminated, neither he nor Mr. Godinez had yet read the report of the investigation, although they had been briefed on the results. He also acknowledged that he never discussed the incident at the Wells Center with Ms. Burns before he asked for the investigation or after he got the results and that he never gave her a reason for her termination.

¶ 21 Ms. Burns testified that she began working for the IDOC in 1981 and became assistant warden at IYC Joliet in 1999. She identified her performance reviews from 1999 through 2004 and discussed the promotions that she received during her tenure with the IDOC. Ms. Burns testified that she suffered from scoliosis, which limited her ability to walk and lift objects and which she first documented with the IDOC in 1993.

¶ 22 In January 2005, Ms. Burns fell on ice at work and was taken to the emergency room. She was diagnosed with various knee injuries but returned to work on February 24, 2005. At that time, her mobility was "very limited," she was in pain, and she had a number of restrictions: limited walking, no bending, and no climbing. She used a walker or cane to walk from her car to her office, but her use of it around the facility was limited due to security concerns. Despite these restrictions, Ms. Burns testified that there were no parts of her job that she could not do.

¶ 23 Ms. Burns testified that she took off work for "almost a month" between March and April 2005 because her sister, for whom she was a caretaker, died. She came back to work but was off again in late April for knee surgery. She returned to work on July 11, 2005, with "light duty" restrictions. Ms. Burns stated that she was walking with limited ability, using a cane, and that going up stairs "really hurt." When she arrived at work, she discovered that her office had been moved from the ground level to the second floor, which was only accessible by stairs. She was told at a meeting that morning that "the plan" was to try to limit the number of times she would have to use the stairs, that they would try to have meetings in her office, and that she would not be required to tour the facility for duty rotation.

¶ 24 In July, prior to returning to work, Ms. Burns found an unstamped envelope in her home mailbox with her name written on it. Her home was actually on the grounds of IYC Joliet. The envelope contained a performance review evaluation form for the period of September 2004

to September 2005, rating her as "acceptable." A note accompanying the form indicated that she should review, sign, and return the form. Ms. Burns did not respond, as she felt leaving an evaluation in a mailbox while she was on leave was "impersonal and cold" and contrary to departmental rules. On August 10, 2005, Larry Peterson, who had taken over as the warden of IYC Joliet from Mr. Rita, called a meeting with Ms. Burns and Mr. Rita. At the meeting, Mr. Peterson directed Mr. Rita to sit down with Ms. Burns and conduct an evaluation.

¶ 25 The evaluation was conducted the next day, August 11, 2005. When Ms. Burns asked Mr. Rita why she had she had been "down-rated from accomplished to acceptable," he answered, "because you weren't here." Ms. Burns protested that she had been on work-related medical leave or approved time off, but Mr. Rita stated that "that was my opinion." Ms. Burns told Mr. Rita she was not going to sign the evaluation form, went back to her office, called Mr. Peterson, and told him she wanted to meet with Mr. Friedenauer. Ms. Burns said that Mr. Peterson asked her to write a response to the evaluation before he called Mr. Friedenauer. At some point thereafter, Ms. Burns called Mr. Friedenauer's office and left a message that she wanted to meet with him about her performance review. She never heard back from him.

¶ 26 Ms. Burns testified that when she went to the doctor at the end of August, she learned that she would need a second surgery on her knee. She informed Mr. Peterson in person that she would be seeking approval for the surgery in the next two to three weeks.

¶ 27 On September 15, 2005, Ms. Burns returned to work from a doctor's visit or physical therapy appointment and stopped by Mr. Peterson's office to check in. About 10 minutes after she returned to her own office, she was called back to Mr. Peterson's office. Mr. Peterson, who was standing near the secretary's desk, indicated that Mr. Friedenauer was in his office and wanted to see her. When Ms. Burns went into the office, Mr. Friedenauer stood and handed her a letter. Ms. Burns said, "I just came from the doctor and you're firing me," took the letter, returned to her office, and started packing her belongings. As she was packing, Mr. Rita came to her office, said Mr. Peterson told him what happened, and stated that he was sorry. According to Ms. Burns, no one ever gave her a reason for her termination.

¶ 28 At the close of Ms. Burns's testimony, her attorney moved for a directed finding as to liability on the basis that the IDOC's failure to articulate a reason for terminating Ms. Burns precluded the IDOC with presenting evidence as to their reason. The ALJ denied the motion, ruling that the IDOC should have the opportunity to present its case on liability. In making this ruling, the ALJ noted that Ms. Burns had "established by at least a scintilla of evidence all the elements of a *prima facie* case for both discrimination based on disability and discrimination based on age," that the IDOC had provided a nondiscriminatory reason for the termination in that they could have stood on their letter stating that Ms. Burns was an at-will employee, and that they were also permitted to provide evidence of the investigation regarding the Wells Center investigation so they carried their burden of presenting a business reason for the termination. He also noted that the testimony of the adverse witnesses "presents ample material for the possibility of [Ms. Burns] refuting the business reason and establishing pretext.".

¶ 29 The IDOC called Mr. Godinez and recalled Mr. Friedenauer as their witnesses. Mr. Godinez was the chief of staff for the IDOC in 2005. He testified that the director of the IDOC, Mr. Walker, generally relied on his recommendation on firing IDOC employees and that he, in turn, relied on Mr. Friedenauer's recommendation to fire Ms. Burns. He was the person who actually signed the letter firing Ms. Burns, on behalf of Director Walker.

¶ 30    Mr. Friedenauer was recalled for the purpose of providing more detail about the April 2005 incident involving the Wells Center. Mr. Friedenauer testified that he initiated an external investigation into the matter after he received letters and grievances from those individuals. He stated that it was a common procedure to have an external, as opposed to internal, investigation when allegations of misconduct were made against employees at Ms. Burns's level. He opined that Ms. Burns's conduct was "completely and totally unacceptable in terms of the behavior expected for somebody in that position."

¶ 31    Mr. Friedenauer testified that the incident with the Wells Center staff was "very significant" to him in making his recommendation. He said, however, that it was "not the sum total of the reasons for which Ms. Burns was terminated." He testified that neither Ms. Burns's age nor her medical condition played a role in his decision to recommend termination. He also said her absences played no role and that, in fact, the facility ran better when she was not around.

¶ 32    In contrast to what he had testified to earlier, during his testimony during the IDOC's case, Mr. Friedenauer testified that he did read the investigative report regarding the Wells Center before he recommended that Ms. Burns be fired and that he also had verbal confirmation of the findings.

¶ 33    The IDOC made an offer of proof as to evidence that it would have liked to put in as to reasons that might have influenced Ms. Burns's termination but were barred from presenting by the ALJ's ruling based on their failure to provide a reason for Ms. Burns's termination in responding to discovery. The offer of proof was Mr. Friedenauer's testimony about other conduct by Ms. Burns particularly during a period in late 1999 and early 2000, when he had direct contact with her.

¶ 34    The parties stipulated that if called as a witness, Mr. Walker, who was the director of the IDOC from 2003 to 2009, would have testified that, at the time of her termination, Ms. Burns was an senior public service administrator (SPSA); that SPSAs are at-will employees who may be terminated at any time for any reason; that Ms. Burns was not terminated because of her age or alleged disability; that he did not sign the letter of termination given to Ms. Burns that bears his signature; and that he delegated various responsibilities to subordinate staff, including signing-off on letters of termination.

¶ 35    The "investigation" was one of the documents submitted to the ALJ, and it is part of the record before this court. It consists of a memo from Mary Hodge, chief of the IDOC Investigations and Intelligence Division, forwarding the investigation to Warden Peterson, with copies to Director Walker, Mr. Friedenauer, and several other people. It is dated September 8, 2005. Attached to that memo is the investigation itself by Larry Sims, with a number of attachments. Mr. Sims did not recommend any specific discipline but concluded that "after a complete review of all information and interviews as well as [Ms. Burns's] self-admission, the allegation of Conduct of Individual by JANICE BURNS is substantiated." The investigator summarized the letters and interviews and attached them. The interviews were with Ms. Burns and Wells Center staff members Muhammad Sales, Judith Winkel, Walter Henderson, and Debi Rauch. The letters were from Mr. Sales, Ms. Winkel, and Mr. Henderson and were written after Mr. Henderson complained to Mr. Rita and Mr. Rita asked him to have the other staff members who were present write letters documenting the meeting.

¶ 36    In his letter, Mr. Sales related that on April 21, 2005, Ms. Burns called a meeting of Wells Center staff to discuss program file compliance in preparation for an upcoming audit. Mr. Sales

stated that "there were moments when the vocabulary from [Ms.] Burns was unprofessional and unwarranted." Mr. Sales said in his letter that he was "very uncomfortable" with the tone of the meeting.

¶ 37    Ms. Winkel started her letter by saying that it was requested by "lead Counselor Walter Henderson." She related that, at the meeting, she had tears streaming down her face because Ms. Burns yelled at her, spoke to her in a condescending, belligerent manner, and humiliated her in front of her colleagues. Ms. Winkel stated that, after the meeting, Ms. Burns told her that if she was "covering up" for anyone who could not do their job, she would be "swept out" with them. She concluded her lengthy letter by saying, "I can only imagine that [Ms. Burns] too was reacting to the stress of upcoming surgery the next day."

¶ 38    Mr. Henderson's own letter said that, prior to the meeting, Ms. Burns called him to her office, asked him why his files were "so f*** up," and told him that if IYC Joliet did not "get 100% on the file audit then if I can't fire you then I'll make your life a living hell in here." When Mr. Henderson told Ms. Burns that the Wells Center's executive director had opined that their files rated a score of 5 out of 10, Ms. Burns responded, "A f*** 5, that's only 50% Walter. I give you all of my time and this is the s*** I get." Ms. Burns then called the meeting with the rest of the Wells Center staff, during which she badgered and intimidated Ms. Winkel and asked her "why in the h***" she did not put certain paperwork in the files. According to Mr. Henderson, after the meeting, Ms. Rauch told him, "[Ms. Burns] shared that I should go upside your head." Mr. Henderson told Mr. Rita in his letter that he was "seeking disciplinary action" against Ms. Burns.

¶ 39    According to the investigator's notes, Mr. Sales and Ms. Winkel confirmed what was in their letters. Mr. Henderson told the investigator that his letter was his statement and added that this was the reason that he had resigned from the Wells Center. The investigator also interviewed Ms. Rauch, the substance abuse supervisor, who said that, just prior to the meeting, Ms. Burns told Mr. Henderson his files were "f*** up" and that Ms. Burns repeated this statement to Mr. Henderson about five times. Ms. Rauch related that Ms. Winkel cried during the meeting but said that Ms. Burns did not threaten to fire anyone or use profanity during the meeting. Ms. Rauch also indicated that Mr. Henderson was always difficult to deal with and that she and Ms. Burns have had to work together to deal with Mr. Henderson.

¶ 40    Ms. Burns was also interviewed. She admitted to the investigator that prior to the meeting, she asked Mr. Henderson, "I hear our files are f*** up, can you tell me why?" Ms. Burns denied using "cuss" words other than that one time and said she did not threaten anyone or threaten to fire anyone. She acknowledged that Ms. Winkel cried during the meeting, that she asked staff if they were covering up for anyone, and that she told them if they did not do well on the audit, "we would all lose our jobs." Ms. Burns denied threatening to walk anyone out and denied telling Ms. Rauch to "go upside" Mr. Henderson's head.

¶ 41    Another IDOC exhibit was an administrative directive setting forth standards of conduct for personnel. The standards provided that "Employees shall conduct themselves in a professional manner and, whether on duty or off duty, shall not engage in conduct which is unbecoming of a State employee or which may reflect unfavorably on or impair operations of the Department." The directive further provided that failure to comply with any of the standards of conduct could result in discipline.

¶ 42    The hearing on Ms. Burns's charge of discrimination was held in June 2009 and then continued until February 2010. The parties submitted posthearing briefs in May and June 2010.

On January 17, 2013, they filed an agreed motion requesting that the matter be reassigned to a different ALJ for the purpose of preparation of findings of fact and issuance of a recommended order and decision. This is permitted by section 8A-102(I)(4) of the Act, which provides that the findings and recommended order may be authored by a hearing officer other than the one who presided at the public hearing if (a) the original hearing officer is unable to author the findings and recommended order by reason of death, disability, or separation from employment and (b) the parties file a joint motion agreeing to have the findings and recommended order written by another hearing officer. 775 ILCS 5/8A-102(I)(4)(a), (b) (West 2012). In her appellate brief, Ms. Burns informs this court that the ALJ who presided over the hearing in 2009 and 2010 retired after the hearing but prior to issuing any recommended order and decision.

¶ 43    On October 7, 2013, ALJ Mariette Lindt, who had not presided at the hearings but had reviewed the record, issued a recommended order and decision. ALJ Lindt recommended that Ms. Burns's complaint and underlying charge be dismissed with prejudice.

¶ 44    As to count I, the ALJ found that Ms. Burns failed to establish a *prima facie* case of age discrimination. Specifically, the ALJ found that Ms. Burns had failed to establish that she was doing her job well enough to meet her employer's legitimate expectations. ALJ Lindt explained that "the April 21st meeting incident alone" demonstrated that Ms. Burns was clearly not performing up to the IDOC's legitimate expectations.

¶ 45    As to count II, the ALJ used a different formulation for the *prima facie* case but again found that Ms. Burns had failed to prove one because she did not provide sufficient proof that she was terminated because of her disability. The ALJ concluded that "[the IDOC]'s articulation that [Ms. Burns] was discharged strictly for poor performance—mainly her unprofessional behavior at the April 21, 2005 meeting—was not proven by [Ms. Burns] to be a pretext for unlawful discrimination."

¶ 46    In November 2013, Ms. Burns filed exceptions to the ALJ's recommended order and decision, requesting that the Commission overturn it. The Commission entered an order on December 13, 2017, declining further review and notifying the parties that the ALJ's recommended order and decision had become the order of the Commission. In January 2018, Ms. Burns filed a motion for rehearing before the full Commission. On October 2, 2018, the Commission entered a final and appealable order, denying that motion. On October 30, 2018, Ms. Burns filed her petition for review in this court.

¶ 47                                    II. JURISDICTION

¶ 48    Ms. Burns timely petitioned this court for review of a final order of the Human Rights Commission entered on October 2, 2018. We have jurisdiction pursuant to section 8-111(B) of the Act (775 ILCS 5/8-111(B) (West 2016)) and Illinois Supreme Court Rule 335 (eff. July 1, 2017).

¶ 49                                    III. ANALYSIS

¶ 50    On appeal, Ms. Burns contends that she presented sufficient evidence to establish all the elements of a *prima facie* case of both disability and age discrimination and that the IDOC's claimed reason for firing her was a pretext for discrimination. We agree with Ms. Burns that the ALJ and the Commission failed to recognize that she did present a *prima facie* case on both

- 9 -

claims and then failed to analyze or consider her evidence that the reason the IDOC gave for terminating Ms. Burns—her meeting with the Wells Center staff in April 2005—was a pretext for one or both forms of discrimination. However, for the reasons outlined below, we conclude that the finding by the ALJ adopted by the Commission—that Ms. Burns failed to ultimately carry her burden of proving discrimination—was not against the manifest weight of the evidence. We therefore affirm.

¶ 51    When an appeal from a commission's decision is taken to this court, we give deference to the commission's findings and will not reweigh the evidence or substitute our judgment for that of the commission. *Willis v. Department of Human Rights*, 307 Ill. App. 3d 317, 327 (1999). Where an appellant raises an issue of law, however, our review is *de novo*. *Jones v. Lockard*, 2011 IL App (3d) 100535, ¶ 16. When the appellant raises an argument that involves a mixed question of law and fact or application of facts to the law, we review for "clear error." *Id.* We may affirm a commission's decision "on any basis appearing in the record, regardless of the actual findings and rulings of the agency." *Habinka v. Human Rights Comm'n*, 192 Ill. App. 3d 343, 372 (1989).

¶ 52    The Act prohibits unlawful discrimination against a person on the basis of either age or disability. 775 ILCS 5/1-102 (West 2006); *Owens v. Department of Human Rights*, 403 Ill. App. 3d 899, 916 (2010). Discrimination can be proved through direct evidence or indirectly through the three-prong test followed by federal courts to determine whether an employer has unlawfully discriminated against an employee. See *Lalvani v. Human Rights Comm'n*, 324 Ill. App. 3d 774, 790 (2001) ("[A] plaintiff may prove discrimination in one of two ways. He may attempt to meet his burden by presenting direct evidence that race was a determining factor in the employment decision, or he may use the indirect method of proof for Title VII cases set forth in [federal Title VII cases].").

¶ 53    One of Ms. Burns's arguments is that she presented sufficient direct evidence of age discrimination. We agree with the IDOC that this evidence did not demonstrate discrimination.

¶ 54    The direct evidence of age discrimination that Ms. Burns points to is Mr. Friedenauer's testimony that he felt a person with 24 years of experience should be held to a higher standard than an employee with less experience. As the IDOC points out, an employer is entitled to rely on the fact that an employee has greater experience in setting higher expectations. *Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1124 (7th Cir. 1998) (noting that an employer "could reasonably expect a higher level of professionalism from [a seasoned employee] with less need for supervision than it could expect from less experienced and lower-ranking sales representatives"); *Foley v. Human Rights Comm'n*, 165 Ill. App. 3d 594, 602 (1988) ("It is reasonable to expect an experienced teacher to be better at her job than an inexperienced teacher.").

¶ 55    Ms. Burns also suggests that she presented direct evidence of disability discrimination because she was told that her evaluation had been downgraded to "acceptable" as a result of her absence from work. However, Ms. Burns's claim is not based on her receiving a low performance evaluation nor does the IDOC suggest that this evaluation was the reason that Ms. Burns was fired. Ms. Burns also argues that she should have been accommodated when she returned. But her claim does not rest on a failure to accommodate; it rests on her termination.

¶ 56    We consider then whether the Commission's finding that Ms. Burns did not prove her claims through circumstantial evidence was against the manifest weight of the evidence.

¶ 57    In analyzing indirect evidence of employment discrimination claims under the Act, the Commission is supposed to apply the analytical framework used by federal courts in cases brought under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.* (2012)). *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178 (1989). Illinois courts look to the decisions of the United States Supreme Court and the United States Court of Appeals for the Seventh Circuit in interpreting the Act. See *Zoepfel-Thuline v. Black Hawk College*, 2019 IL App (3d) 180524, ¶ 26.

¶ 58    The indirect method of proof for Title VII cases was set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that test, the employee must first establish, by a preponderance of the evidence, a *prima facie* case of unlawful discrimination. *Id.* at 802; *Zaderaka*, 131 Ill. 2d at 178-79. If a *prima facie* case is established, a rebuttable presumption arises that the employer unlawfully discriminated against the petitioner, and the employer may rebut the presumption by articulating a legitimate, nondiscriminatory reason for its employment decision. *Zaderaka*, 131 Ill. 2d at 179. If the employer articulates such a reason, then the petitioner must prove, by a preponderance of the evidence, that the employer's reason was untrue and a pretext for discrimination. *Id.* The ultimate burden of persuasion remains with the employee. *Id.*

¶ 59    The elements of a *prima facie* case have been articulated by our courts in various ways. In *Kreczko v. Triangle Package Machinery Co.*, 2016 IL App (1st) 151762, ¶ 27, we said that the plaintiff must show that "(1) he or she is a member of a protected class; (2) he or she was performing satisfactorily; (3) he or she was discharged despite the adequacy of her work; and (4) a similarly situated employee who was not a member of the protected group was not discharged." In *Illinois J. Livingston Co. v. Human Rights Comm'n*, 302 Ill. App. 3d 141, 152-53 (1998), we said that an employee established a *prima facie* case of unlawful age discrimination by showing by a preponderance of the evidence that "(1) the complainant is a member of a protected class (age 40 or over), (2) he was doing the job well enough to meet his employer's legitimate expectations, (3) he was discharged or demoted, and (4) the employer sought a replacement for him." In specific reference to disability discrimination, we have said that a *prima facie* case requires an employee to show "(1) that he/she is handicapped within the definition of the Act, (2) that an adverse action was taken against the employee due to his/her handicap, and (3) that the handicap is unrelated to the employee's ability to perform the functions of his/her job." *Lake Point Tower, Ltd. v. Human Rights Comm'n*, 291 Ill. App. 3d 897, 903 (1997). We have also recognized that "the nature of a *prima facie* case varies according to the case" and the essential elements may vary depending on circumstances. *ISS International Service System, Inc. v. Human Rights Comm'n*, 272 Ill. App. 3d 969, 978 (1995).

¶ 60    Here, the finding of ALJ Lindt on Ms. Burns's age discrimination claim was that Ms. Burns failed to establish a *prima facie* case of age discrimination because she was not doing her job well enough to meet her employer's legitimate expectations. The ALJ concluded that "based on the April 21st meeting incident alone" she could "reasonably conclude that [Ms. Burns] was clearly terminated for the nondiscriminatory reason of inappropriate ill treatment of counselors that worked under her." However, the fact that the IDOC was able to articulate some nondiscriminatory reason for Ms. Burns's termination should not have ended the inquiry. Rather, since she received a rating of acceptable after the meeting at the Wells Center, which Mr. Rita knew something about when he evaluated her, the issue then became whether the investigation was the real reason or was, instead, simply a pretext for discrimination.

¶ 61    In reference to the claim of disability discrimination, ALJ Lindt and the Commission used a slightly different but equally flawed analysis. The ALJ found that Ms. Burns did not establish a *prima facie* case because she did not provide "sufficient proof" that she was terminated because of her disability. In support of this conclusion, the ALJ said the "[IDOC]'s articulation that [Ms. Burns] was discharged strictly for poor performance *** mainly her unprofessional behavior at the April 21, 2005 meeting—was not proven by [Ms. Burns] to be a pretext for unlawful discrimination." In support of this finding, the ALJ cited the fact that Ms. Burns was given some "accommodations to make her work somewhat easier"—such as light duty when she returned to work and being able to drive her car close to her office—that a disabled employee is not exempt from discipline, and that the termination occurred after a formal investigation substantiated her misconduct.

¶ 62    Although the ALJ mentioned "pretext" in reference to the disability discrimination claim, there was still no analysis of whether the IDOC's reliance on Ms. Burns's conduct at the April 21, 2005, meeting was a pretext for discrimination. The ALJ's analysis was therefore incomplete.

¶ 63    There was at least some evidence of pretext in this case, including the fact that the IDOC never gave Ms. Burns any reason for her termination. Mr. Friedenauer admitted he never discussed Ms. Burns's termination or his concerns about her conduct at the April 21, 2005, meeting with her. The IDOC never provided a written answer to the interrogatories that explained why she was terminated. At one point, Mr. Friedenauer admitted that he had not read the investigative report at the time Ms. Burns was fired, although he later testified that he had read it.

¶ 64    Further evidence of pretext was the fact that other employees who engaged in serious misconduct or performed unsatisfactorily were retained. We have recognized that "[o]ne method of showing pretext is to demonstrate that employees involved in misconduct of comparable seriousness were retained while the complainant was discharged." *Loyola University of Chicago v. Human Rights Comm'n*, 149 Ill. App. 3d 8, 19 (1986). Mr. Rita agreed that one employee was suspended for five days for improperly rubbing an inmate, another was disciplined for conducting a background check for personal reasons, and a third was suspended for one day for losing paperwork and for three days for intentionally giving false information after discovering a youth had made a comb into a shank. None of these employees was terminated. The IDOC witnesses pointed out that these employees had greater job protection because they belonged to the union. But Mr. Friedenauer admitted that another senior public service administrator had been rated as unacceptable in 2004 and 2005 and was disciplined by being suspended for five days. Another employee who, like Ms. Burns, was an assistant warden and was also rated as unacceptable was demoted rather than terminated. There was also evidence from both Ms. Burns and Mr. Rita that other employees at the IDOC used profanity.

¶ 65    Ms. Burns argues that the timing of the termination was also suspect—she was fired five months after the meeting at the Wells Center but only two weeks after telling her supervisors that she needed another knee surgery. In addition, Ms. Burns argues that the investigation itself was flawed because Mr. Henderson, the counselor at the Wells Center who prompted the investigation, was improperly working a second job and was using her behavior at the meeting as an excuse for leaving when he was actually about to be fired.

¶ 66    Generally, whether an employer's articulated reason for terminating an employee was pretextual is a question of fact. *Zaderaka*, 131 Ill. 2d at 180. Here, it is clear that there were

serious problems with the way that the IDOC handled Ms. Burns's termination. It never documented whatever issues there were with Ms. Burns's performance. In discovery, the IDOC failed to provide Ms. Burns and her lawyers with an explanation for her termination. Mr. Friedenauer claims to have relied on the Wells Center investigation, but it is unclear whether he had even read it when he recommended that Ms. Burns be terminated, and it is undisputed that he never discussed it with her, despite her long tenure with the IDOC.

¶ 67 There were also problems with how the Commission, through the ALJ, considered and analyzed the evidence. We have outlined above our concerns with the analysis that the ALJ used. In addition, the ALJ specifically cited evidence of Ms. Burns's conduct in 1999 through 2000, when that was evidence that was barred and was only put in as the IDOC's offer of proof. Of course, it is also unfortunate for all of the parties that the ALJ who heard the evidence was no longer with the Commission when the opinion was written, and we therefore do not have the benefit of credibility findings by someone who heard live testimony.

¶ 68 Notwithstanding these issues, we affirm. We have examined the evidence of pretext, and we do not think that Ms. Burns has met her burden on appeal of showing that the Commission's factual finding that she failed to prove discrimination was against the manifest weight of the evidence.

¶ 69 In reference to other employees who were not terminated, none of them were shown to be in parallel situations to Ms. Burns. While Mr. Friedenauer testified that "to [his] knowledge" these employees were not disabled, there was also no evidence that they were younger than Ms. Burns, that they behaved as she did, or that the decision makers involved were the same. While there was evidence that other employees used profanity, the problems raised at the Wells Center meeting went beyond using profanity and there was no evidence as to who the employees were who used profanity or what the circumstances were. Ms. Burns presented evidence that Mr. Henderson may have had his own improper motivation in bringing about the Wells Center investigation. However, his motivation is not relevant to her termination, and in any event, it had nothing to do with her age or her disability. Ms. Burns makes much of the timing of her termination, months after the meeting at the Wells Center and only shortly before she was scheduled to have another surgery. However, Ms. Burns was terminated just one week after the investigation was provided to the decision makers in this case. Ms. Burns also makes much of the IDOC's failure to provide her with a reason for her termination, either while she was with the IDOC or in response to discovery in this case. As noted above, we agree that this can be evidence of pretext, and in this case, it quite properly severely limited the IDOC's ability to defend itself. However, it is not, in itself, sufficient to establish age or disability discrimination.

¶ 70 In short, while we agree with many of the concerns raised by Ms. Burns, we will affirm here because we do not think the Commission's ultimate finding that Ms. Burns failed to prove discrimination was against the manifest weight of the evidence or that the Commission's application of the facts to the law was clearly erroneous.

¶ 71                                IV. CONCLUSION
¶ 72 We affirm the Commission's dismissal of Ms. Burns's complaint.

¶ 73 Affirmed.