2025 IL App (1st) 240373-U
No. 1-24-0373
Order filed August 21, 2025

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| KEVIN SMITH, | ) | Petition for Direct Administrative Review of a Decision of the Human Rights Commission. |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 2017 CF 1428 |
| | ) | |
| ILLINOIS BELL TELEPHONE COMPANY, THE | ) | |
| HUMAN RIGHTS COMMISSION, and THE | ) | |
| DEPARTMENT OF HUMAN RIGHTS, | ) | |
| | ) | |
| Respondents. | ) | |

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lyle and Ocasio concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm the order of the Illinois Human Rights Commission granting summary decision in favor of respondent on petitioner's race-based employment discrimination charge.

¶ 2   Petitioner Kevin Smith (Smith) appeals the order of respondent Illinois Human Rights Commission (the Commission) granting summary decision to respondent Illinois Bell Telephone Company (Bell) in Smith's race-based employment discrimination claim under the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq*. (West 2016)). For the following reasons, we affirm.

¶ 3    The record reflects that, in 2006, Bell, a telecommunication and entertainment services company and a subsidiary of AT&T Services, Inc. (AT&T), hired Smith, who is Black, as a Sales Account Manager. In 2008, he was promoted to Network Service Manager (NSM). In 2016, AT&T Technology Operations (ATO) underwent a reduction in force, or a "surplus process," of management positions. On October 28, 2016, Bell informed Smith his position would be eliminated, and Smith's last day was December 27, 2016.

¶ 4    On January 3, 2017, Smith filed an employment discrimination charge with the Illinois Department of Human Rights (the Department), alleging, *inter alia*, that he was terminated because of his race. The Department determined that substantial evidence supported Smith's race-discrimination claim and, on June 4, 2018, filed on his behalf a complaint with the Commission.

¶ 5    The Department's complaint alleged that Bell eliminated Smith's position because of his race, in violation of the Act. According to the complaint, Bell did not eliminate the positions of similarly-situated, non-black NSMs who had received worse ratings or scores according to Bell's job metrics, namely, David Feber, Anthony Quintana, and Mark Refness. The complaint further alleged that Bell's stated reason for eliminating Smith's position, that it was part of a workforce reduction in Smith's business unit, was a pretext for discrimination. The complaint noted that Bell denied that it selected Smith for elimination of his position based on race. The Department had requested that Bell provide documentation supporting its position, which Bell failed to produce, and the Department inferred that the requested documentation would have contradicted Bell's stated reason for eliminating Smith's position.

¶ 6    On June 24, 2022, Bell filed a motion for summary decision, requesting a recommended order in its favor granting summary decision and dismissing Smith's charge with prejudice. The

following facts are drawn from the exhibits attached to the parties' briefings on the motion, including affidavits; answers to interrogatories; materials related to the surplus process; and performance evaluations for Smith and other employees created before and as part of the surplus process.

¶ 7    As an NSM, Smith was responsible for coaching, leading, and developing a team of technicians who installed and repaired various products and services. He reported to area manager Robert Leeds, who reported to "Director—Internet & Entertainment Field Services" John Hudzik. Neither Leeds nor Hudzik are Black.

¶ 8    In a December 2015 "My Performance Plan" (MPP), Leeds rated Smith as "Exceeds" expectations in the category of "Business Results," "Fully Meets" in the category of "Leadership," and "Fully Meets" in "Overall Performance Rating," which ranked him third among nine other managers in Smith's area. He received an Exceeds in "Cumulative Business Rating" for the year, and "120.74%" in "Cumulative Attain."

¶ 9    In 2016 midyear MPPs, Smith received ratings of Fully Meets in Business Results, Leadership, and Overall. For the same categories, respectively, Feber received a Does Not Meet, Exceeds, and Meets Some; Quintana received a Meets Some, Fully Meets, and Fully Meets; Refness received a Meets Some, Fully Meets, and Fully Meets; and Sammie Kleit, a non-Black development coach also supervised by Leeds, received Meets Some, Fully Meets, and Fully Meets. Smith averred that, in August 2016, Leeds gave him a performance-based raise and said his performance was better than any of his peers. In September 2016, Leeds gave Smith a Meets Some overall rating, and told Smith he was one of Leeds's top three managers. Another MPP scorecard reflects that, from January through October 2016, Smith received a Meets Some Business Rating

and a "97.16%" "Cumulative Attain." Respectively, Feber received a Meets Some and 97.09%, Quintana received a Does Not Meet and a 95.97%, and Refness received a Meets Some and 97.66%.

¶ 10    In fall 2016, ATO "identified a need to reduce management positions within the Internet and Entertainment Field Services business unit to ensure *** [Bell's] workforce aligned with the needs of the business, its customers, and the operating environment." This reduction in force involved the review of 414 management positions located across Illinois, Indiana, Michigan, Wisconsin, and Ohio, with the intention to eliminate 85 positions. The affected employees were divided into 20 "Affected Work Groups" (AWGs) based on job titles and primary work functions. One AWG, AWG 13, included 65 NSMs and 7 ATO Development Coaches in Hudzik's chain of command, including Smith and the others Leeds supervised, for a total of 72 employees. Eighteen of the seventy-two positions in AWG 13 would be eliminated, with their duties absorbed by the remaining employees. On October 4, 2016, Bell held a meeting with the employees in AWG 13 to announce the reduction in force "in response to decreasing customer demand for legacy services" and to reduce costs.

¶ 11    Selection for the reduction in force would be based on responses to an "Interest in Leaving" survey, "the needs of the business," and "Surplus Guidelines" supplied by AT&T. The Surplus Guidelines provided for the rating of AWG 13 employees in the following four weighted categories: 35% Leadership, 25% Skills, 25% Performance (as measured at the time of assessment), and 15% Experience. Leadership was divided into five subcategories: Character, Leading Change, Interpersonal Skills, Personal Capability, and Focus on Results.

¶ 12    To determine the ratings, a "mechanized rating system" was adopted. Under that system, the supervising area managers would be trained in the rating process and provide each of their employees a score of 1 to 5 in each category, with 1 being the lowest and 5 being the highest. Then, Hudzik would meet with the area managers and "calibrate" the ratings to ensure they were applied consistently. Afterwards, Hudzik would enter the ratings into a system that calculated the rankings of the employees within the AWG. The 18 employees ranked from 55 to 72 within AWG 13 would have their positions eliminated.

¶ 13    The Surplus Guidelines also required analysis for implications associated with state and federal Worker Adjustment and Retraining Notification (WARN) Acts (820 ILCS 65/1 *et seq.* (2016), 29 U.S.C.A. § 2101 *et seq.* (2016)) and an Equal Employment Opportunity (EEO) analysis for indications of potential adverse impact, which were "mechanized functions that [were] initiated automatically" upon submission of the surplus selection and required approval by "Corporate Legal/HR" before employees were notified of their selection for surplus.

¶ 14    On October 6, 2016, Leeds submitted his initial assessment of the nine affected employees who reported to him. The following table provides their ratings and whether they were Black or non-Black:

| Employee | Performance 25% | Skills 25% | Experience 15% | Leadership 35% | Total |
|---|---|---|---|---|---|
| Dejeanette Gandy Black | 2 | 2 | 2 | 2.8 | 2.28 |
| Kevin Smith Black | 3 | 2 | 2 | 3 | 2.6 |
| Patricia Olivieri Non-Black | 3 | 3 | 3 | 3.4 | 3.14 |
| Mark Refness Non-Black | 3 | 4 | 3 | 3.2 | 3.32 |

| | | | | | |
|---|---|---|---|---|---|
| David Feber<br>Non-Black | 2 | 4 | 3 | 4.2 | 3.42 |
| Anthony Quintana<br>Non-Black | 3 | 4 | 4 | 3.2 | 3.47 |
| Terry Keyes<br>Black | 3 | 4 | 4 | 3.8 | 3.68 |
| Eric Zirkle<br>Non-Black | 3 | 5 | 5 | 3.8 | 4.08 |
| Sammie Kleit<br>Non-Black | 3 | 5 | 4 | 4.6 | 4.21 |

¶ 15    Based on Leeds's ratings, Smith ranked 61 of the 72 employees in AWG 13. After Hudzik met with the area managers to calibrate their scores, he adjusted Smith's Performance rating from 3 to 2, noting that Smith's "Current perform[an]ce falls below previous ratings." His total score became 2.21, which placed him 68 of 72 in AWG 13. Hudzik also adjusted Olivieri's Skills rating from 3 to 2. As a result of Hudzik's calibrations, two employees, one White (Olivieri) and one Black, had moved from outside the bottom 18 of AWG 13 to within it, and two other employees, one Black and one Hispanic or Latino, moved from within the bottom 18 to outside it.

¶ 16    Following the calibrations, 2 employees within AWG 13, who did not rate in the bottom 18 of the group slated for surplus, accepted offers to leave Bell, meaning the remaining employees ranked from 57 to 72 would be terminated. Bell then reduced the number of positions within AWG 13 to be eliminated by 2, so those employees rated 59 or worse would lose their positions. Two other employees within AWG 13 accepted positions in different organizations within Bell, leaving those rated 61 or worse to be terminated. As a result, the two other employees who had moved from above the surplus line to below it due to Hudzik's calibrations were retained, including Olivieri. In the final rankings of AWG 13, the affected employees that Leeds supervised received

the following rankings: Kleit ranked 8, Zirkle ranked 9, Keyes ranked 17, Quintana ranked 22, Feber ranked 25, Refness ranked 29, Olivieri ranked 57, Gandy ranked 66, and Smith ranked 68.

¶ 17    Gandy then accepted an Interest in Leaving offer. The remaining employees ranked 61 to 72 within AWG 13, including Smith, were declared surplus. On October 28, 2016, Smith received notice that his position would be eliminated, and elected to continue his employment for up to 60 days to pursue other positions within Bell. He did not secure another position and was terminated on December 27, 2016.

¶ 18    Smith claimed in an affidavit and an answer to interrogatories that Leeds told him he submitted Quintana and Refness's names for surplus elimination but Hudzik "disregarded the formula" and selected Smith for elimination using a "subjective scheme." Smith also averred that no non-Black manager had their position eliminated after Hudzik reduced their score.

¶ 19    Bell argued that Smith could not establish a *prima facie* case of race discrimination as he could not show that non-Black employees who were similarly situated to him were treated more favorably. Bell asserted that Smith was eliminated due to a legitimate, non-discriminatory reason, namely, as part of a reduction in force, and Smith could not show that reason was pretext for discrimination.

¶ 20    Smith filed a response contending that similarly-situated non-Black employees were treated more favorably than he, and Bell's stated reason for terminating him was pretext for unlawful discrimination as his MPP scores were not worse than those of Quintana, Feber, and Refness, who were not eliminated. He noted that, in the surplus process, he and Gandy received lower scores in Experience than Quintana, Refness, Feber, and Kleit, although Quintana and Refness had only been NSMs since 2014, Feber for less than a year, and Kleit had never been a

manager. Gandy had been a manager for about 14 years; Smith for about 8 years. He argued that the decision to evaluate employees under a new subjective scheme rather than the employees' prior evaluations was designed to negatively impact him and Gandy because they were Black.

¶ 21     On May 30, 2023, an administrative law judge (ALJ) issued a recommended order granting Bell's motion for summary decision and entering judgment in Bell's favor. The ALJ found that Smith could not establish a *prima facie* case of race discrimination as he could not demonstrate that similarly situated, non-Black employees were treated more favorably. The ALJ noted that Smith was in line to be eliminated based on his ranking within AWG 13 by Leeds, before Hudzik adjusted his score, and the MPP performance evaluations involved "very different criteria and analyses" than the surplus ratings.

¶ 22     The ALJ further found that, although there was no need to examine the question of pretext, Smith could not demonstrate that the legitimate, non-discriminatory reason offered for Bell's decision was pretext. The ALJ explained that the only evidence Smith offered to show that Bell's reason for terminating him was pretextual was his prior evaluations and his own affidavit and responses to interrogatories claiming that he had performed better than some of the non-Black employees who were not terminated. The ALJ remarked that Smith's opinion and speculation were not admissible or relevant in opposition to summary decision. The ALJ found that there were no genuine issues of material fact on the pretext issue and Bell was entitled to a recommended order in its favor as a matter of law.

¶ 23     On July 14, 2023, Smith filed exceptions to the ALJ's recommended order. On January 30, 2024, the Commission entered an order declining further review of the case and adopting the ALJ's

recommended order as its own. On February 20, 2024, Smith filed a petition for direct administrative review in this court.

¶ 24    On appeal, Smith challenges the Commission's order granting summary decision to Bell and finding that he failed to establish a *prima facie* claim for race discrimination. He argues there are genuine issues of material fact regarding whether Bell's stated non-discriminatory reason for eliminating his position was a pretext for race discrimination.

¶ 25    Initially, Bell argues that Smith has forfeited his factual contentions by providing insufficient citations to the record on appeal. Illinois Supreme Court Rule 341(h) (eff. Oct. 1, 2020) provides that an appellant's brief shall contain a statement of facts including references to pages of the record on appeal, and an argument section including his contentions "and the pages of the record relied on." Ill. S. Ct. R. 341(h)(6), (7) (eff. Oct. 1, 2020). However, Smith's brief includes some citations to the record, the record is not complicated, and Smith's failure to strictly comply with Rule 341 does not hinder our ability to review his arguments. We will therefore consider the merits of his request for direct administrative review. See *Marzouki v. Najar-Marzouki*, 2014 IL App (1st) 132841, ¶ 12 (a reviewing court may consider the merits of an appeal even where there are Rule 341 mistakes).

¶ 26    The Act prohibits race-based discrimination and deems it a civil rights violation for an employer to discharge an employee based on unlawful discrimination. 775 ILCS 5/1-102(A), 2-102(A) (West 2016). When an employee files a charge of discrimination, it is first investigated by the Department to determine whether substantial evidence supports the charge. *Id.* § 7A-102. If so, the Department may file a complaint on the employee's behalf in an administrative proceeding before the Commission. *Id.* § 7A-102(F)(1); *Schwartz v. Illinois Human Rights Comm'n*, 2024 IL

App (4th) 231248, ¶ 8. The Commission assigns the case to an ALJ, who oversees the litigation and recommends an order. 775 ILCS 5/8A-102 (West 2018); *Schwartz*, 2024 IL App (4th) 231248, ¶ 8.

¶ 27 Following the ALJ's recommended order, the losing party before the ALJ may ask a panel of the Commission to review the recommended order. 775 ILCS 5/8A-103(E)(1) (West 2018); *Schwartz*, 2024 IL App (4th) 231248, ¶ 9. The panel may decline to review the recommended order, in which case the ALJ's decision becomes the order of the Commission. 775 ILCS 5/8A-103(E)(1) (West 2018). The losing party before the Commission may then seek direct review in this court. 775 ILCS 5/8-111(B) (West 2022); see Ill. Const. 1970, art. VI, § 6 (the appellate court may directly review administrative actions as provided by law); see also 735 ILCS 5/3-113 (West 2024) (establishing procedures for statutory direct review).

¶ 28 Here, the Department filed a complaint with the Commission on Smith's behalf and the ALJ issued a recommended order granting summary decision to Bell. A panel of the Commission declined to review the recommended order. Thus, the ALJ's recommended order became the order of the Commission and the order at issue before this court.

¶ 29 A summary decision under the Act is appropriate where there is no genuine issue as to any material fact and the movant is entitled to decision as a matter of law. 775 ILCS 5/8-106.1(2) (West 2022). To defeat a summary decision, the claimant must present evidence sufficient for a reasonable factfinder to infer that his employer acted against him because of his membership in a protected class. *Sola v. Illinois Human Rights Comm'n*, 316 Ill. App. 3d 528, 538-39 (2000). A summary decision is comparable to summary judgment. *Id.* at 534. When considering whether to grant summary judgment, the record must be construed strictly against the movant and liberally in

favor of the nonmovant, and it should only be granted "if the movant's right to judgment is clear and free from doubt." *Givens v. City of Chicago*, 2023 IL 127837, ¶ 46. "Genuine" means there is evidence to support the nonmovant's position. *McLaughlin v. Cook County*, 2023 IL App (1st) 221869, ¶ 30. A summary decision is reviewed *de novo*. *Sola*, 316 Ill. App. 3d at 534-35.

¶ 30    In analyzing employment discrimination claims, Illinois courts adopt the three-part test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178-79 (1989). Under *McDonnell Douglas*, the petitioner must first establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination. *Spencer v. Illinois Human Rights Comm'n*, 2021 IL App (1st) 170026, ¶ 33. To state a *prima facie* case, a claimant must show that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate business expectations; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated employees outside the class more favorably. *Id.* ¶ 34.

¶ 31    The *prima facie* analysis asks only whether, ignoring contrary evidence, the claimant has produced enough evidence to support his case. *People v. Relwani*, 2019 IL 123385, ¶ 18; *Habitat Company v. McClure*, 301 Ill. App. 3d 425, 439 (1998). The more favorable treatment of similarly-situated employees outside the protected class must create an inference of unlawful discrimination (*Lau v. Abbott Laboratories*, 2019 IL App (2d) 180456, ¶ 39), as it is "[e]ssential to a claim of discrimination" that the adverse treatment of the claimant "was motivated by the [claimant's] membership in a protected class" (internal quotation marks omitted) (*Spencer*, 2021 IL App (1st) 170026, ¶ 37). If the claimant establishes a *prima facie* case, a rebuttable presumption arises that

the employer discriminated against the claimant. *Burns v. Bombela-Tobias*, 2020 IL App (1st) 182309, ¶ 58.

¶ 32    The second step of the *McDonnell Douglas* framework allows the employer to rebut the presumption of discrimination by articulating, without needing to prove, a legitimate, nondiscriminatory reason for the adverse employment action that the claimant suffered. *Spencer*, 2021 IL App (1st) 170026, ¶ 33. The third and final step requires the claimant to prove by a preponderance of the evidence that the employer's stated reason was a pretext for discrimination. *Id.* The burden of persuasion remains on the claimant throughout the proceedings. *Zaderaka,* 131 Ill. 2d at 179.

¶ 33    Here, the ALJ determined that Bell was entitled to summary decision as Smith failed to meet the first and third steps of the *McDonnell Douglas* test. Turning first to whether Smith established a *prima facie* case of unlawful discrimination, the parties disagree only as to whether Smith showed that similarly-situated employees outside his protected class were treated more favorably. We agree with the ALJ that Smith did not make that necessary showing.

¶ 34    The record shows that, in fall 2016, Bell underwent a reduction in force that involved reviewing more than 400 management positions located in Illinois, Indiana, Michigan, Wisconsin, and Ohio. To determine which positions would be eliminated, Bell applied AT&T's Surplus Guidelines rating system, and rated affected employees in the categories of Leadership, Performance, Skills, and Experience. Smith and 71 other affected employees were members of AWG 13, including the other employees Leeds supervised. The lowest-ranked 18 employees in AWG 13 would lose their positions.

¶ 35    After Leeds rated his supervisees, Smith ranked 61 out of 72 in AWG 13. Hudzik then calibrated the ratings given by Leeds and the other area managers, adjusting the scores of several employees. Hudzik gave Smith a lower score in Performance than Leeds had, noting his performance had fallen below previous levels, and Smith then ranked 68 out of 72. Hudzik also lowered Olivieri's Skills rating.

¶ 36    Hudzik's calibrations moved 2 employees ranked in the bottom 18 of AWG 13, including one Black employee, to outside the bottom 18, and moved 2 other employees, including one Black employee, from outside the bottom 18 to within it. Following Hudzik's calibration, Smith was ranked 68 out of 72. Then, as some employees in AWG 13 accepted offers to leave or transfers within Bell, and Bell determined that fewer positions in AWG 13 needed to be eliminated, only the bottom 12 employees in AWG 13 were in line to be terminated as part of the reduction in force. As Smith was within the bottom 12, his position was eliminated.

¶ 37    Smith has not shown that, during this process, similarly-situated employees outside his protected class were treated more favorably under circumstances creating an inference of unlawful discrimination. *Lau*, 2019 IL App (2d) 180456, ¶ 39. Whether another employee is similarly situated to a claimant requires a "flexible, common-sense examination of all relevant factors." (Internal quotation marks omitted.) *Id.* ¶ 46. Usually, a similarly situated employee (1) deals with the same supervisor, (2) was subject to the same standards, and (3) "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." (Internal quotation marks omitted.) *Id.* However, there is no "magic formula." *Id.*

¶ 38    Here, the employees similarly-situated to Smith at the time his position was eliminated were the other employees who ranked in the bottom 12 of AWG 13 following the two-step surplus rating process. They had all been rated by their supervisors, had their ratings all calibrated by Hudzik, and fell within the group that Bell had previously determined would lose their positions as part of its reduction in force. There is no evidence that any non-Black employee who ranked in the bottom 12 of AWG 13 at the end of the surplus rating process maintained their position.

¶ 39    Smith makes no cogent argument that the other employees who ranked in the bottom 12 of AWG 13 were not similarly situated to him or that non-Black employees ranked in the bottom 12 of AWG 13 received more favorable treatment. Rather, he argues that Feber, Refness, and Quintana, who are non-Black and similarly-situated employees because they were NSMs receiving MPP evaluations by Leeds, were treated more favorably. Specifically, he and Gandy, both Black, were subject to termination, while non-Black Feber, Refness, and Quintana were not despite having spent fewer years as NSMs than he and Gandy and receiving worse mid-year 2016 performance evaluations than Smith. Smith also notes that no non-Black manager had their position eliminated after Hudzik reduced their score during calibration, and he was given no "warning" that his performance was insufficient or probationary period to improve it.

¶ 40    Smith's arguments are unpersuasive. As the ALJ noted, the MPP ratings were based on different criteria than provided for in the Surplus Guidelines, which were sufficiently different such that assessors received training on the Surplus Guidelines. The MPP ratings focused on whether an employee was meeting the expectations set for them, while the Surplus Guidelines were aimed at comparing employees to one another to determine whose positions would be eliminated. Thus, Smith's argument that he was not warned his performance failed to meet

expectations is unavailing, as the reduction in force determination was based on a comparative performance evaluation at the time of the surplus rating.

¶ 41  Moreover, the Surplus Guidelines instructed that the Performance rating was for an employee's performance level at the time of assessment, which is reflected in Hudzik's comment that Smith's performance at the time of assessment fell below his previous levels. As to Leadership, in the 2016 midyear MPPs, Feber received Exceeds, and Quintana, Refness, and Kleit all received Fully Meets, just as Smith did, but the Surplus Guidelines provided for more detailed, subcategory-based Leadership criteria. Also, Skills and Experience were not measured in the MPPs. Smith contends that the amount of time he and Gandy had spent as managers means that they have more skills and experience than Feber, Quintana, Refness, and Kleit, but this is a subjective and conclusory opinion about his and Gandy's qualifications, which cannot defeat summary decision. See *National Union Fire Insurance Co. of Pittsburgh v. DiMucci*, 2015 IL App (1st) 122725, ¶ 68. Further, the Surplus Guidelines applied weighted categories in computing a total rating, unlike the MPP evaluation.

¶ 42  Additionally, before Hudzik's calibration process, Leeds rated Keyes, who is Black, higher than non-Black Oliviera, Feber, Quintana, and Refness. Smith disputes that Keyes was similarly situated to him as Keyes worked in another location and had only joined Leeds's team in 2016, making it more difficult to compare Keyes's performance data to Smith's. However, Smith makes no effort to explain how Leeds rating Keyes above several non-Black employees shows that Black employees received worse treatment than non-Black employees during the surplus ratings process. And, while Smith complains that Bell has never provided an affidavit from Leeds explaining how Leeds arrived at the surplus ratings, Hudzik averred that the pre-calibration ratings included in the

record were, in fact, those provided by Leeds, and Leeds's ratings speak for themselves regarding his assessment of his supervisees. As to Hudzik's calibration process, he not only reduced the ratings of Smith and another Black employee, but also reduced the score of Olivieri, a non-Black NSM supervised by Leeds, and increased the rating of another Black employee.

¶ 43    Based on the foregoing, Smith has not established a *prima facie* case of race-discrimination as he has not shown that similarly situated employees outside his protected class were treated more favorably at any step in the surplus process, *i.e.* during the initial assessments, calibration process, or ultimate selection for surplus. *Spencer*, 2021 IL App (1st) 170026, ¶ 34. No reasonable factfinder could infer that his employer acted against him because of his membership in a protected class. *Sola*, 316 Ill. App. 3d at 538-39. Thus, the ALJ correctly concluded that summary decision was appropriate. *Id.*; see 775 ILCS 5/8-106.1(2) (West 2022) (summary decision is appropriate where there is no genuine issue of material fact and the movant is entitled to order as a matter of law).

¶ 44    Moreover, even assuming, *arguendo*, that Smith established a *prima facie* case, Bell articulated a legitimate, nondiscriminatory reason for his discharge: that he was ranked in the bottom 12 of the 72 employees in AWG 13 at the end of the surplus rating process implemented to meet changing business needs and reduce costs. Smith cannot show that this reason was a pretext for race discrimination.

¶ 45    Pretext is "more than just faulty reasoning or mistaken judgment," but "a phony reason." (Internal quotation marks omitted.) *Lau*, 2019 IL App (2d) 180456, ¶ 55. A claimant can raise an inference of pretext and defeat summary decision by showing the employer's stated reason is implausible or contradictory. *Id.* (citing *Coleman v. Donahoe*, 667 F.3d 835, 852-53 (7th Cir.

2012)). "To meet this burden, [a claimant] must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [an employer's] asserted reason that a reasonable person could find [it] unworthy of credence." (Internal quotation marks omitted.) *Coleman*, 667 F.3d at 852-53; see *Zaderaka*, 131 Ill. 2d at 178 (claims under the Act are evaluated according to federal decisions interpreting federal antidiscrimination laws). We are not to substitute our business judgment for an employer's business judgment. *Sola*, 316 Ill. App. 3d at 544-45.

¶ 46    Smith cites no compelling evidence that Bell's reason for his termination as part of reduction in force is implausible, contradictory, or phony. All employees ranked within the top 60 of AWG 13 were retained or left their position of their own accord, regardless of race, and all employees ranked within the bottom 12 of AWG 13 had their positions eliminated, regardless of race, except Gandy, who accepted an Interest in Leaving offer. Leeds rated Keyes, a Black NSM, higher than non-Black employees. Hudzik adjusted the ratings of Black and non-Black employees upwards and downwards. Smith was within the surplus group before and after Hudzik calibrated the ratings. AT&T utilized "mechanized functions" to analyze surplus selections for indications of a potential EEO adverse impact and compliance with WARN legislation to support a nondiscriminatory assessment process.

¶ 47    Smith argues that he has presented evidence that Bell's reason is pretext because he outperformed non-Black employees in the prior MPP evaluations. He repeats that Bell has never provided an affidavit from Leeds explaining how Leeds arrived at the surplus ratings. However, his focus on the MPP ratings is misplaced. The relevant question is whether there exists a genuine issue of material fact that the elimination of his position as part of a reduction in force involving more than 400 employees across multiple states was pretext for race discrimination. See *Young v.*

*Illinois Human Rights Comm'n*, 2012 IL App (1st) 112204, ¶ 48 ("[T]he unfairness or unreasonableness of an employer's conduct is irrelevant, so long as it was not motivated by an employee's protected characteristic."). His opinion that his surplus ratings had no basis in fact in light of his performance evaluations and length of time as a manager compared to Feber, Quintana, Refness, and Kleit does not make Bell's stated reason for his elimination implausible or contradictory such that a reasonable person would find it unworthy of credence. Smith essentially takes issue with Bell's decision to use the Surplus Guidelines rather than MPP scores as a basis to eliminate positions. We decline Smith's request to substitute our business judgment for Bell's business judgment regarding that decision. *Sola*, 316 Ill. App. 3d at 544-45.

¶ 48     Moreover, even considering the MPP ratings, while Smith received an Exceeds in Business Results for 2015, and 120.74% in "Cumulative Attain," in October 2016, for the period of January to October, he received only Meets Some in Business Results and 97.16% in Cumulative Attain. This comports with Hudzik's comment that his performance had fallen below its previous levels.

¶ 49     In sum, Smith provided no evidence that similarly situated employees outside his protected class were treated more favorably than he, as required to establish a *prima facie* case of unlawful discrimination, or that Bell's stated nondiscriminatory reason for the elimination of his position was a pretext for race discrimination. Accordingly, Bell was entitled to summary decision as a matter of law.

¶ 50     For the foregoing reasons, we affirm the order of the Commission.

¶ 51     Affirmed.